Daniel R. Shaw, Esq. (SBN 281387)
Shaw Firm
3196 S. Higuera St. Suite E
San Luis Obispo, CA 93401
Phone: (805) 439-4646
Facsimile: (805) 301-8030
daniel@shawfirm.com

Attorneys for Plaintiffs J.M.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.M., a minor, by and through his guardian ad litem Farrah McWilliams,<br><br>Plaintiffs,<br><br>v.<br><br>TULARE CITY SCHOOL DISTRICT.<br><br>Defendants. | Case No. 21-1102<br><br>**COMPLAINT FOR RELIEF:**<br><br>(1) For Partial Reversal of Administrative Hearing Decision Pursuant To 20 U.S.C. § 1415(i)(2)(A);<br>(2) For Compensatory Damages for Violation of Section 504;<br>(3) For Compensatory Damages for Violations of the Americans with Disabilities Act; and<br>(4) Attorneys Fees under 20 U.S.C. § 1415<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs J.M. allege as follows:

## **PARTIES**

1. Plaintiff J.M. is a five-year-old special education student with autism. J.M. qualified for special education under the category of autism in July of 2019. J.M. is also a qualified individual with a disability pursuant to Title II of the Americans with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973.

2. Defendant Tulare City School District[1] ("Tulare") is a public school district duly organized and existing under the laws of the State of California and is located within

---

[1] The Office of Administrative Hearing ("OAH") issued a decision in OAH Case No. 2021030770 identifying Tulare as "Tulare City Unified School District." However, Tulare is not a unified school district, and its correct name is Tulare City School District.

Solano County. Tulare receives federal financial assistance.

3. Tulare is a public entity duly incorporated and operating under California law as a school district. Tulare is therefore subject to the Title II of the Americans with Disabilities Act of 1990, the requirements of the Rehabilitation Act of 1973, the requirements of California state law requiring full and equal access to public facilities pursuant to Government Code §§ 11135 and 4450, et seq., and to all other legal requirements referred to in this Complaint.

4. In enacting Title II of the Americans with Disabilities Act, Congress validly abrogated state sovereign immunity, and thus Tulare may be sued pursuant to Title II. *Hanson v. Med. Bd. Of California*, 279 F.3d 1167, 1170 (9th Cir. 2002). By accepting Federal Rehabilitation Act funds, Tulare has waived their sovereign immunity under the Eleventh Amendment to claims brought pursuant to Section 504 of the Rehabilitation Act of 1973. *Pugliese v. Dillenberg*, 246 F.3d 937 (9th Cir. 2003).

## JURISDISCTION AND VENUE

5. Venue in this Court is proper because all events and omissions giving rise to the claims occurred in Tulare County, within this district.

6. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 1343.

## FACTS COMMON TO ALL CAUSES OF ACTION

7. J.M. was a five-year-old student who qualified for special education under the categories of autism and other health impairment ("OHI"). J.M.'s verbal communication, resistance to environmental change, motor deficits and difficulties sustaining attention adversely impacted his ability to access typical preschool activities.

8. In August of 2018, J.M. was diagnosed with Autism, ADHD, Phonological Disorder, Global Developmental Delay, and Receptive and Expressive Speech Delay.

9. J.M. had a long history of maladaptive behavior issues in the home. Prior to attending preschool, J.M. received in-home behavior services to address his non-compliant behaviors, aggressions, and self-injurious behaviors.

1

10. During the 2019-2020 school year, J.M. was a preschool aged student and was enrolled to attend school within Tulare.

11. On March 16, 2020, Tulare was closed for in-person instruction as a result of the COVID-19 pandemic.

12. Tulare only offered J.M. work packets to be completed with his mother.

13. J.M.'s mother attempted to use the work packets to no avail.  J.M. engaged in serious maladaptive behaviors, including self-injurious behavior and physically attacking his mother.

14. J.M.'s mother reported these concerns to Tulare prior to and during the IEP meetings discussed herein.

15. On April 29, 2020, Tulare convened J.M.'s annual IEP.  What has become known as the "April 29, 2020 IEP," was developed over the course of several IEP meetings convened during the months of April, May, and June of 2020.

16. The April 20, 2020 IEP failed to provide a clear offer of a free appropriate public education.  The IEP document stated the following:

"A combined program of placement in the smaller intervention group and larger classroom was discussed to assist with the transition back into school.  It is recommended that [J.M.] attend the smaller intervention group for at least 2 weeks at the start of the school year, prior to transitioning to the larger general education classroom."

17. The April 29, 2020 IEP failed to specify how much time J.M. would spend in the smaller intervention group or the larger general education classroom.  The April 20, 2020 IEP failed to specify how much time J.M. would spend with his typical peers when he was being educated outside the general education setting.

18. J.M. also asserts the smaller intervention group was not a general education placement. The smaller intervention group consisted of no more than ten students, half of whom were special education students.  The other half of the students was compromised of preschool aged children with speech and/or behavior issues but not yet eligible for special

2

education. The intervention group also included a higher staff to student ratio to support the needs of its students than was provided in the general education setting.

19. Indeed, the United States Department of Education defines a, "regular early childhood program" as a program that includes a <u>majority of children without disabilities</u> *and* may include: 1) Head Start; 2) kindergartens; 3) preschool classes offered to an eligible pre-kindergarten population by the public school system, etc. *Dear Colleague Letter*, 69 IDELR 106 (OSEP 2017). At hearing, it was clear the majority of students in the smaller intervention classroom were students with special needs as defined under the IDEA. This rendered that setting a special day classroom setting and not a general education placement.

20. Tulare offered two different general education placements as possibilities. One classroom operated five days per week for three hours per day and the other operated two days per week for four hours per day.

21. The April 29, 2020 IEP stated without clarity, that J.M. would be provided less than ten hours per week of a preschool program. If Tulare was offering a fifteen hour per week preschool placement, the IEP reflected an entirely different number of hours of instruction—something less than ten hours per week. Furthermore, as discussed below, the amount of time J.M. was in the preschool setting directly impacted the amount of one-to-one aide support he would receive.

22. In April of 2020, J.M. began to receive center-based behavior services based on the principles of applied behavior analysis with an agency called Talk ABA. Talk ABA was funded through J.M.'s private insurance. Talk ABA was located about an hour from J.M.'s home. Prior to the pandemic, Talk ABA planned to open a clinic close to J.M.'s home. However, once the pandemic began, they put those plans on hold. J.M.'s mother had no choice but to take him to Talk ABA and make the two hours round trip daily so he could receive his required interventions. Furthermore, because of the pandemic, private ABA companies were not taking new clients. The lack of private ABA services

continued for many months. Initially, Talk ABA did not report the same aggressive and self-injurious behaviors J.M.'s mother was seeing at home. This would shortly change.

23. On May 13, 2020, the IEP team met to discuss J.M.'s placement. This meeting was audio recorded. Initially, Tulare offered to start J.M. in the smaller intervention group and then transition him in the larger general education classroom. During that discussion, and in response to J.M.'s mother requesting he be placed in a larger general education setting, Tulare discussed a "blended" program. Tulare provided examples, such as J.M. starting his day for a short period of time in the smaller intervention group and then transitioning into the larger general education classroom. This discussion ended with Tulare saying they would need to develop a plan of what the blended program would look like. No such plan was ever offered, rendering Tulare's offer of FAPE unclear.

24. Furthermore, with respect to the larger general education placement, Tulare put the onus on J.M.'s mother to select between the fifteen hour per week program or the eight hour per week program. It was Tulare's responsibility to offer a FAPE to J.M. The number of hours J.M. would spend in a school setting was critically important because his IEP stated he would be provided with a one-to-one aide trained in applied behavior analysis based on his program of enrolment. This was another flaw regarding the clarity of Tulare's FAPE offer.

25. J.M., as a student with autism, required an aide with training in applied behavior analysis. In order to offer a meaningful program based on his unique needs, it was critical to determine and document how much aide support he would receive. Furthermore, the IEP also stated J.M. would not be provided with his one-to-one aide when working directly with another adult. J.M.'s mother believed this would be during times he was pulled out of the classroom setting to receive speech and language or physical therapy services. However, during the due process hearing, it was stated these times would also include small group instruction for some unspecified period. This made it impossible for J.M.'s mother to know how much trained aide support J.M. would be receiving, as it clearly was not based on his program of enrollment as stated in his IEP.

4

26. On May 21, 2020, Tulare convened another IEP meeting. At this meeting, Talk ABA reported that J.M. had regressed and was showing aggression in the clinic setting—something they had not previously seen. J.M.'s mother shared that aggression had also increased at home. If J.M. had a demand placed on him or was denied access to something, he would resort to hitting and spitting.

27. On June 9, 2020, Tulare convened another IEP meeting. At this meeting, Talk ABA provided an update that J.M.'s behavior continued to escalate in the clinic setting with noncompliant behavior, tantrums, elopement, aggression to adults, aggression to peers, spitting, and property destruction. This increase was seen despite J.M. being in a structured clinic setting with trained aide support.

28. During this period of time, J.M. had to go to the emergency room because he bloodied his own nose and blackened one of his eyes as a result of his maladaptive behaviors.

29. Over the summer of 2020, J.M.'s mother continued to take him to Talk ABA for four hours per day. Initially, J.M.'s maladaptive behavior continued to increase until mid-summer. At that point, there was a decrease in behaviors seen in the clinic. However, at home, J.M.'s mother still struggled to get instructional control over her son. J.M. was not used to having so many demands placed on him at home. Home was a place where he could do preferred activities. When his mother attempted to place demands on him, he would elope and/or become aggressive.

30. J.M.'s developmental physician from Stanford, Dr. Anne Berens, recommended he not be provided with distance learning instruction and instead focus on in-person support. J.M. was placed on antipsychotic medicine because of the severity of his behaviors.

31. Over the summer of 2020, J.M.'s mother did go to observe the two general education programs Tulare had proposed. However, there was nothing to see because the classrooms were empty.

32. On July 29, 2020, J.M.'s attorneys provided Tulare with a notice of unilateral placement.

33. On August 12, 2020, Tulare convened an IEP meeting to discuss J.M.'s notice of unilateral placement. However, Tulare's attorney asserted that under no circumstance

|   |   |
|---|---|
|   | would Tulare provide any in-person support to J.M. nor would they consider contracting with anyone to do so.  This refusal to consider alternative options was predetermination. |
| 34. | The August 2020 IEP failed to offer a clear distance learning plan.  Moreover, there was no aide support offer to assist J.M.'s mother in completing the one-and-a-half hours per day of asynchronous work in the home.  Nothing was offered despite J.M.'s mother stating she little instructional control over her son.  During the hearing, Tulare's special education director testified there were a number of private ABA companies that served Tulare.  If that was true, nothing prevented Tulare from contracting with one of these providers to ensure J.M.'s IEP was implemented, and he could meaningfully access distance learning.  J.M. could not meaningfully access distance learning without a similar level of support he required to access his in-person instruction. |
| 35. | J.M.'s mother was able to secure a private preschool program that operated in-person.  However, because J.M. required a one-to-one aide, Talk ABA said they could only offer support in the Fresno area.  This limited J.M.'s mother choices and she had no local options to provide the required ABA support. |
| 36. | J.M. made great progress in his private preschool.  In fact, by April of 2021, J.M. could sit and attend in circle time (a non-preferred task) for forty minutes with minimal adult support.  This was in stark contrast to Tulare's goal that by April of 2021 J.M. would sit on a non-preferred task (e.g. circle time, music time, etc.) for a total of two minutes with no more than two adult prompts. |
| 37. | On March 22, 2021, J.M.'s parents requested a due process hearing with the Office of Administrative Hearings ("OAH").  Attached as Exhibit 1.  The case was identified as OAH Case No. 2021030770.  The due process hearing lasted eleven days.  On September 24, 2021, the OAH issued a decision where J.M. partially prevailed on some issues related to the 2019-2020 school year. |
| 38. | J.M. has exhausted his administrative remedies as required by law by completing the due process hearing with the OAH. |

///

### FIRST CLAIM FOR RELIEF

*Denial of a Free Appropriate Public Education Because Tulare Failed to Make A Clear Offer of FAPE.*

**(Against Tulare)**

39. Plaintiffs refer to, and incorporate herein by reference, all of the preceding paragraphs as though fully set forth herein.

40. J.M.'s April 29, 2020, IEP failed to make clear offer of a free appropriate public education ("FAPE").

41. J.M.'s distance learning plan failed to include a clear offer of a FAPE.

42. In 1994, the Ninth Circuit recognized the importance of a formal clear written offer in *Union School Dist. v. Smith* ("*Union*"). 15 F.3d 1519, 1526 (9th Cir. 1994). In *Union*, the Court held failing to make a clear offer of FAPE was a procedural violation because it would prevent the parent from understanding what was being offered and would greatly hinder a parent in presenting a complaint regarding issues arising under the IDEA. *Id*. at. 1526.

43. In 2017, the Ninth Circuit reinforced the importance of a formal clear written offer in *M.C. by and through M.N. v. Antelope Valley Union High School District* ("*Antelope*"). 858 F.3d 1189, 1199 (9th Cir. 2017). In *Antelope*, relying upon *Union*, the Court held that mere discussions at the IEP about services left out of the IEP document (e.g. a discussion about additional services) result in an unclear FAPE offer. Indeed, in *Antelope*, the Ninth Circuit again reiterated that a parent must not only be able to participate in the formulation of an IEP but in its *enforcement*. *Id*. (emphasis added). An IEP that is unclear renders the IEP a useless "blueprint for enforcement." *Id*.

44. In the underlying administrative proceeding, the ALJ found that the offer of placement in the April 29, 2020 IEP was "unclear" and "incapable of enforcement." The ALJ determined the April 29, 2019 IEP failed to describe J.M.'s educational setting in a "coherent manner." Despite these findings, the ALJ opined that J.M.'s mother understood the two classrooms being proposed and thus there was no denial of

meaningful parental participation in the development of the April 29, 2029 IEP which was deemed "unclear" and "incapable of enforcement."

45. At hearing, J.M.'s mother testified she did not understand the April 29, 2020 offer of FAPE. J.M.'s mother testified she believed that J.M. was being offered a "combination" program where he would spend some unspecified amount of time in small intervention preschool program and larger general education classroom, and then move full time into the larger general education setting. It was unclear how much time J.M. would spend with his typical peers in the general education setting versus a separate setting.

46. Additionally, J.M. disputes the finding that the smaller intervention group was a typical preschool setting. Aside from the name, the evidence at hearing clearly demonstrated at least half the students in the intervention classroom were student with disabilities under the IDEA, and the other half were students with behavior or language-based issues. The intervention group only allowed for a total of ten students and included a higher student-to-teacher ratio because of the needs of the students in the classroom. The intervention group was not a general education preschool. J.M.'s time in the intervention group constitutes specialized designed instruction under the IDEA—also referred to as specially designed instruction in California. See 34 C.F.R. § 300.39(b)(3).

47. A child with a disability who meets eligibility requirements under the IDEA is entitled to a *written IEP document*. 20 U.S.C. 1414(d)(1)(A)(i). There are a number of requirements that must be included in a written IEP. This includes a written statement, "of the *special education* and relates services and supplementary aids and services," including, "program modifications or supports for school personnel." 20 U.S.C. 1414(d)(1)(A)(i)(IV). The term "*special education*" is defined as *specially designed instruction* at no cost to the parents to meet the unique needs of a child with a disability. 34 C.F.R. § 300.39 (emphasis added). Federal law defines the term "specialized designed instruction" as "adapting, as appropriate to the needs of an eligible child under this part, the *content, methodology, or delivery of instruction*" to meet the child's unique needs and to ensure access of the general curriculum. 34 C.F.R. § 300.39(b)(3). J.M.'s

8

April 29, 2020, IEP failed to clearly identify how much specially designed instruction he would receive in the smaller intervention group.

48. Tulare offered a wide variety of placement options which included starkly different amounts of time J.M. would spend in the larger general education setting. J.M.'s mother could either choose a fifteen hour per week program or an eight hour per week program. At hearing, various Tulare witnesses testified this decision was up to J.M.'s mother. A school district cannot offer a wide variety of placement options, each of which includes distinct programs, and request a parent to choose. See *Glendale Unified Sch. Dist. v. Almasi* (C.D.Cal. 2000) 122 F.Supp.2d 1093, 1108 ("*Glendale*"). In *Glendale*, the Court considered a school district's offer of whether an offer of four different placements was procedurally proper. *Glendale, supra*, at p. 1107. The Court determined that Union required a district to formally offer a single, specific program, reasoning that, "[o]ffering a variety of placements puts an undue burden on a parent to eliminate potentially inappropriate placements and makes it more difficult for a parent to decide to accept or challenge the school district's offer." *Id*.

49. J.M.'s distance learning plan for the 2020-2021 school year also lacked clarity. The plan failed to clearly specify how much one-to-one aide support J.M. would be provided.

50. The ALJ ignored the preponderance of evidence and failed to apply binding case precedent to this issue.

## SECOND CLAIM FOR RELIEF

*Denial of a Free Appropriate Public Education Because Tulare Failed to Implement J.M.'s IEP.*

**(Against Tulare)**

51. Plaintiffs refer to, and incorporate herein by reference, all of the preceding paragraphs as though fully set forth herein.

52. During the 2020-2021 school year, Tulare denied J.M. a free appropriate public education by failing to implement his operative IEP.

53. J.M.'s April 29, 2020 IEP provided him with a behavior support plan and a one-to-one behavior aide trained in applied behavior analysis throughout the entirety of his school

9

day. J.M. was a student with autism who required applied behavior analysis and a one-to-one aide to access his learning environment in a structured small classroom setting—let alone through a distance learning model where his parent would become his teacher.

54. During the 2020-2021 school year, Tulare enrolled J.M. in a fifteen-hour-per-week preschool program. Yet, J.M. was not provided with 15 hours per week of a one-to-one behavior aide trained in applied behavior analysis—either in person or through a distance learning program, as called for in his operative IEP.

55. A school district is responsible to provide eligible students with a FAPE by delivering special education and related services, "in conformity with" the student's IEP. 20 U.S.C. § 1401(9)(D). "IEPs are clearly binding under the IDEA, and the proper course for a school that wishes to make material changes to an IEP is to reconvene the IEP team pursuant to the statute – not to decide on its own no longer to implement part or all of the IEP." *Van Duyn v. Baker School Dist. 5J*, 502 F.3d 811, 821 (9th Cir. 2007) ("*Van Duyn*") (citing 20 U.S.C. §§ 1414(d)(3)(F), 1415(b)(3)). "A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." *Id*. at p. 815.

56. J.M.'s April 29, 2020 IEP stated that he would engage in "escape/avoidance" behavior when presented with a non-preferred task 76.5 percent of the time. The IEP went on to state that when presented with a non-preferred task, J.M. could attend independently (without adult prompting) for only 12.5 seconds. Furthermore, the April 29, 2020, IEP contained an "attention" goal that stated in a year, with the provision of the supports and services contained in the IEP, J.M. would be able to attend to a non-preferred task for a total of one minute with no more than two adult prompts. J.M.'s need for behavior support was great. J.M. was the only student in Tulare's preschool program that required a one-to-one aide to access his learning environment.

57. Tulare clearly failed to implement J.M.'s operative IEP.

58. The ALJ ignored the preponderance of evidence and failed to apply binding case precedent to this issue.

## THIRD CLAIM FOR RELIEF

*Denial of a Free Appropriate Public Education Because Tulare Failed to Offer Adequate Behavior Supports.*

**(Against Tulare)**

59. Plaintiffs refer to, and incorporate herein by reference, all of the preceding paragraphs as though fully set forth herein.

60. J.M.'s April 29, 2020 IEP provided him with a behavior support plan and a one-to-one behavior aide trained in applied behavior analysis throughout the entirety of his school day. J.M. was a student with autism who required applied behavior analysis and a one-to-one aide to access his learning environment in a structured small classroom setting—let alone through a distance learning model where his parent would become his teacher.

61. During the 2020-2021 school year, Tulare enrolled J.M. in a fifteen-hour-per-week preschool program. Yet, J.M. was not provided with 15 hours per week of a one-to-one behavior aide trained in applied behavior analysis—either in person or through a distance learning program, as called for in his operative IEP.

62. J.M.'s distance learning plan only offered 1.5 hours per day of virtual aide support during virtual instruction.

63. Additionally, J.M. was offered 1.5 hours per day of "asynchronous" work packets to be completed with his mother. The ALJ found the very same model was inadequate for the 2019-2020 school year in response to the COVID-19 school shutdown because of the lack of behavior support that was necessary for J.M. to access the learning environment. Nonetheless, the ALJ determined that for 2020-2021 school year, the same model was adequate. Other than parent consultations, J.M. was not offered any other behavior supports which were provided for in his April 29, 2020 IEP.

64. The ALJ ignored the preponderance of evidence and failed to apply binding case precedent to this issue.

///

///

# FOURTH CLAIM FOR RELIEF

*Denial of a Free Appropriate Public Education Because Tulare Predetermined J.M.'s Distance Learning Supports.*

**(Against Tulare)**

65. Plaintiffs refer to, and incorporate herein by reference, all of the preceding paragraphs as though fully set forth herein.

66. Tulare clearly predetermined J.M.'s distance learning services by refusing to consider—or even discuss—the provision of any in-person services for J.M. at the August 12, 2020 IEP.

67. This was not a situation where Tulare discussed the need for such support in a meaningful manner. On the contrary, when J.M.'s attorney attempted to get Tulare to discuss the possibility of providing Jackson with some level of in-person support, Tulare's own attorney stated in clear terms the school district was not going to consider the provision of in-person support, nor would they consider contracting with any outside providers.

68. When preponderantly proven, the first prong of predetermination requires evidence the district violated the requirements for "meaningful" parental participation in the formulation of the IEP. *H.B. v. Las Virgenes Unified Sch. Dist.*, 239 F. App'x 342, 344 (9th Cir. 2007), *further proceedings sub nom. Berry v. Las Virgenes Unified Sch. Dist.*, 370 F. App'x 843 (9th Cir. 2010); *see also R.L. v. Miami Dade Cnty. Sch. Bd.,* 757 F.3d 1173 (11th Cir. 2014); *E.H. v. N.Y.C. Dep't of Educ.*, 164 F. Supp. 3d 539 (S.D.N.Y. 2016); *D.B. v. Gloucester Twp. Sch. Dist.*, 751 F. Supp. 2d 764 (D.N.J. 2010), *aff'd*, 489 F. App'x 564 (3d Cir. 2012); *B.H. v. W. Clermont Bd. of Educ.*, 788 F. Supp. 2d 682 (S.D. Ohio 2011). The second prong, like any procedural violation, requires evidence the parent's opportunity to participate in the formulation of the IEP was significantly impeded. 20 U.S.C. § 1415(f)(3)(E)(ii)(II). School administrators and staff must enter the IEP team meeting with an <u>open mind and must meaningfully</u> consider the parents' input. *HB., et al v. Las Virgenes Unified School Dist* (9th Cir. 2007) 239 Fed. Appx. 342,

344; see also, *Ms. S ex rel G v. Vashon Island Sch. Dist* (9th Cir. 2003) 337 F.3d 1115, 1131.  A district may not arrive at an IEP team meeting with a "take it or leave it" offer. *JG v. Douglas County School Dist* (9th Cir. 2008), 552 F.3d 786, 801, fn. 10.

69. The ALJ determined it was not predetermination because at the time of the August 12, 2020 IEP meeting, California had a "stay-at-home" order in effect.  However, that could not be further from the truth.  California had no "stay-at-home" order in effect at the time of the August 12, 2020 IEP meeting.  On the contrary, numerous private preschools were in operation and providing in-person services.  Moreover, state guidance also encouraged school districts to consider contracting with outside providers to support students with disabilities who required in-person support.

70. The ALJ findings on this point were simply not correct.

## FOURTH CLAIM FOR RELIEF

*Denial of a Free Appropriate Public Education For Failing To Provide Adequate Distance Learning Supports.*

**(Against Tulare)**

71. Plaintiffs refer to, and incorporate herein by reference, all of the preceding paragraphs as though fully set forth herein.

72. Tulare failed to offer J.M. an adequate distance learning program.

73. J.M.'s April 29, 2020 IEP stated that he would engage in "escape/avoidance" behavior when presented with a non-preferred task 76.5 percent of the time.  The IEP went on to state that when presented with a non-preferred task, J.M. could attend independently (without adult prompting) for only 12.5 seconds.  Furthermore, the April 29, 2020 IEP contained an "attention" goal that stated in a year, with the provision of the supports and services contained in the IEP, J.M. would be able to attend to a non-preferred task for a total of one minute, with no more than two adult prompts.  J.M.'s need for behavior support was great.  J.M. was the only student in Tulare's preschool program that required a one-to-one aide to access his learning environment.

///

...

74. Tulare refused to offer or consider any in-person support to allow J.M. to access his educational program.

75. J.M.'s mother explained she lacked instructional control over J.M., who would engage in self injurious behavior in response to her attempts to work with him.

76. J.M.'s IEP provided placement in a small, structured setting with a one-to-one aide trained in applied behavior analysis. Tulare believed the supports and services contained in the April 29, 2020 IEP provided a free appropriate public education. J.M.'s distance learning program did not provide anything close to the behavior support required by this April 29, 2020 IEP.

## FIFTH CLAIM FOR RELIEF

*Violation of Section 504 of the Rehabilitation Act of 1973*

**(Against Tulare)**

77. Plaintiffs refer to, and incorporate herein by reference, all of the preceding paragraphs as though fully set forth herein.

78. J.M. is informed and believes, and on that basis alleges, that Tulare was, at all relevant times, a recipient of federal funds, and that part of those funds were used in the operations, construction and/or maintenance of the specific public facilities and programs described herein and the activities that take place therein.

79. J.M. is a qualified individual with a disability. J.M has autism which substantially limits his major life activities of, *inter alia*, socialization, behavior, communications, and adaptive functioning.

80. By its actions or inactions in denying meaningful and equal access to educational services, Tulare discriminated against J.M. by failing to provide an appropriate education (including aid, benefits, or services) pursuant to 34 C.F.R. § 104.33. As a result, Tulare violated J.M.'s rights under Section 504 of the Rehabilitation Act of 1973.

81. By its actions or inactions in denying meaningful and equal access to educational services, Tulare discriminated against J.M. by failing to provide an appropriate education (including aid, benefits, or services) pursuant to 34 C.F.R. § 104.38. As a result, Tulare

14

violated J.M.'s rights under Section 504 of the Rehabilitation Act of 1973.

82. By its actions or inactions, Tulare violated Section 504 of the Rehabilitation Act of 1973 by failing to afford J.M. an equal opportunity to participate in or benefit from the aid, benefit, and services provided by a public education in violation of 34 C.F.R. § 104.4.  As a result, the Tulare violated J.M.'s rights under Section 504 of the Rehabilitation Act of 1973.

83. By its actions or inactions, Tulare violated Section 504 of the Rehabilitation Act of 1973 by denying J.M. the reasonable accommodations necessary to achieve meaningful access to his education.  J.M. could not meaningfully access his learning environment (either through distance learning or direct in-person instruction) without the provision of a one-to-one aide trained in applied behavior analysis.  The failure to provide these obvious accommodations violated J.M.'s rights under Section 504 of the Rehabilitation Act of 1973.

84. The discrimination described herein constitutes a violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 749, et seq.), which provides that, "no otherwise qualified individual with a disability shall, solely bey the reason of his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

85. Tulare acted with deliberate indifference to J.M.'s rights under Section 504, as described herein, by knowingly failing to provide J.M. the supports and services he required to access his education to the same extent as his non-disabled peers.  Moreover, J.M.'s required supports and services were obvious to the casual observer.

86. As a direct and proximate result of Tulare's discrimination, J.M. suffered damages in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**

*Violation of Section Title II of the Americans with Disabilities Act of 1990*

**(Against Tulare)**

87. Plaintiffs refer to, and incorporate herein by reference, all of the preceding paragraphs as

15

though fully set forth herein.

88. At all relevant times, J.M. was entitled to the protections of the "Public Services" provision of Title II of the Americans with Disabilities Act of 1990 ("Title II"). Title II, Subpart A prohibits discrimination by any "public entity," including any state or local government, as defined by 42 U.S.C. § 12131, Section 201 of the ADA. Tulare is a "public entity" and subject to Title II.

89. Pursuant to 42 U.S.C. § 12132, Section 202 of Title II, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity. J.M. was at all times relevant herein, a qualified individual with a disability, as defined herein.

90. By its actions or inactions in denying equal access to educational services, Tulare discriminated against J.M. by failing to provide adequate behavior supports such that J.M. could meaningfully access distance learning.

91. Tulare acted with deliberate indifference to J.M.'s rights under Title II, as described herein, by knowingly failing to provide J.M. the supports and services he required to benefit from her education. Moreover, J.M.'s required supports and services were obvious.

92. As a result of Tulare's failure to comply with its duty under Title II, J.M. has suffered damages including special and general damages according to proof.

## SEVENTH CLAIM FOR RELIEF

*Legal Fees*

**(Against Tulare)**

93. Plaintiffs refer to, and incorporate herein by reference, all of the preceding paragraphs as though fully set forth herein.

94. Under 20 U.S.C. § 1415(i)(3)(B), this Court may award reasonable attorneys' fees to a prevailing party who is the parent of student with a disability.

95. J.M. seeks a finding by this Court that J.M. was the prevailing party in this case. As

such, J.M. is entitled to payment of his attorneys' fees from Tulare for the fees related to the underlying administrative hearing and this Court claim.

96. J.M. seeks a finding that he is entitled to reimbursement of reasonable legal fees in an amount to be determined by this Court.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request the following relief:

97. A finding that Tulare failed to offer J.M. a free appropriate public education for the reasons set forth herein.

98. Equitable relief ordering Tulare to reimburse J.M's mother for the cost of unilaterally placing J.M. in a private school setting, including mileage reimbursement.

99. Compensatory damages, including but not limited to, the cost of J.M.'s insurance-funded aide support;

100. Statutory interest;

101. Costs of suit incurred herein inclusive of attorneys fees; and

102. For such other relief as this Court may deem just and proper.

SHAW FIRM

DATED: December 14, 2021          By: *Daniel R. Shaw*
                                       Daniel R. Shaw
                                       Shaw Firm
                                       Attorney for J.M.