# EXHIBIT ONE

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

———————————————

## CASE NO. 2021030770

———————————————

PARENTS ON BEHALF OF STUDENT,

v.

TULARE CITY UNIFIED SCHOOL DISTRICT.

———————————————

# DECISION

## SEPTEMBER 24, 2021

On March 22, 2021, Parents on behalf of Student filed a due process hearing request naming Tulare City Unified School District, referred to as Tulare City.  On May 7, 2021, OAH granted Student's request to amend the complaint.

Administrative Law Judge Jennifer Kelly heard this matter by videoconference in California on June 29, 30, July 1, 13, 15, 27, 28, 29 and August 3, 4 and 5, 2021.

Attorney Daniel R. Shaw represented Student.  Paralegal Eric Wooten attended each hearing day.  Parent attended all hearing days.

Attorney Lisa C. Dennis represented Tulare City.  Michelle Zavaleta, Tulare City Director of Special Education, attended all hearing days on Tulare City's behalf, except on July 1, 2021.  Jennifer Marroquin, Tulare City Director of Early Childhood Education, attended on July 1, 2021.

At the parties' request, OAH continued the matter to August 30, 2021, for closing briefs, and September 13, 2021 for reply briefs.  The parties timely filed their closing and reply briefs, the record was closed, and the matter was submitted on September 13, 2021.

## ISSUES

The issues have been reorganized for clarity based upon Student withdrawing issues at the commencement of the hearing, and upon discussion with the parties and ALJ.  The ALJ has authority to renumber and redefine a party's issues, so long as no substantive changes are made.  (*J.W. v. Fresno Unified School Dist.* (9th Cir. 2010) 626 F.3d 431, 442-443.)

1. Did Tulare City deny Student a free appropriate public education, called FAPE, during the 2019-2020 school year and extended school year, by:

    a. Failing to make a clear offer of FAPE in the April 29, 2020 Individualized Education Program, called IEP;

    b. Failing to offer adequate behavior support in the April 29, 2020 IEP;

    c. Failing to implement Student's IEP, beginning March 13, 2020;

    d. Failing to offer adequate extended school year services;

    e. Predetermining Student's distance learning; and

    f. Failing to offer adequate distance learning supports?

2. Did Tulare City deny Student a FAPE during the 2020-2021 school year, through May 7, 2021, by:

   a. Failing to implement Student's IEP;

   b. Failing to offer adequate behavior support;

   c. Failing to make a clear offer of FAPE;

   d. Predetermining Student's distance learning; and

   e. Failing to offer adequate distance learning supports?

## JURISDICTION

This hearing was held under the Individuals with Disabilities Education Act, its regulations, and California statutes and regulations.  (20 U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006) et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.) The main purposes of the Individuals with Disabilities Education Act, referred to as the IDEA, are to ensure:

- all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living, and

- the rights of children with disabilities and their parents are protected.  (20 U.S.C. § 1400(d)(1); See Ed. Code, § 56000, subd. (a).)

The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, assessment, or educational placement of the child, or the provision of a FAPE to the child.  (20 U.S.C.  § 1415(b)(6) & (f); 34 C.F.R. § 300.511; Ed. Code, §§ 56501, 56502, and 56505; Cal. Code Regs., tit. 5, § 3082.)  The jurisdiction of OAH is limited to

these matters.  (*Wyner v. Manhattan Beach Unified School. Dist.* (9th Cir. 2000) 223 F.3d 1026, 1028-1029.)  The party requesting the hearing is limited to the issues alleged in the complaint, unless the other party consents, and has the burden of proof by a preponderance of the evidence.  (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i); *Schaffer v. Weast* (2005) 546 U.S. 49, 57-58, 62 [126 S.Ct. 528, 163 L.Ed.2d 387]; and see 20 U.S.C. § 1415(i)(2)(C)(iii).)  Student filed the due process complaint and therefore had the burden of proof in this matter.  The factual statements in this Decision constitute the written findings of fact required by the IDEA and state law.  (20 U.S.C. § 1415(h)(4); Ed. Code, § 56505, subd. (e)(5).)

Student was five years old at the time of hearing and was entering transitional kindergarten.  Student resided with Parents within Tulare City's geographic boundaries at all relevant times.  Student was eligible for special education under the category of autism.

## APPLICATION OF IDEA TO PRESCHOOL STUDENTS

Under the IDEA and California special education law, school districts must offer an IEP to eligible students who turn three years of age.  (20 U.S.C. § 1412(A)(1); 34 C.F.R. § 300.101(a); Ed. Code, § 56001, subd. (b).)  For the period between three and six years of age, California does not mandate compulsory education for typically developing preschool children.  (Ed. Code, § 48200.)  However, if a preschool child requires special education and related services to receive a FAPE, school districts must offer the child an appropriate program.  (20 U.S.C. § 1414(d)(1)(A); Ed. Code, §§ 56345, subd. (a)(1)(B) and 56441.2.)

A school district is required to ensure the placement decision for a preschool aged child with a disability is made by a group of people, including the parents and

4

other people knowledgeable about the student's evaluation data and is in the least restrictive environment.  (34 C.F.R. § 300.114 through 34 C.F.R. § 300.118.)  The group of people making the placement decision must consider whether supplementary aids and services could be provided that would enable the education of a preschool child with a disability in the regular educational setting to be achieved satisfactorily.  (34 C.F.R. § 300.114(a)(2); *Dear Colleague Letter*, OSERS (January 9, 2017) 69 IDELR 106.)

For preschool aged children, the IEP must contain a statement of the child's present levels of academic achievement and functional performance including, as appropriate, how the disability affects the child's participation in appropriate activities. (Ed. Code, § 56345(a)(1)(B); 34 C.F.R. § 300.320(a)(1)(ii).)  In contrast, for kindergarten aged children and older, the IEP must include a statement how the child's disability affects the child's involvement and progress in the general educational curriculum.  (Ed. Code, § 56345(a)(1)(A); 34 C.F.R. § 300.320(a)(1)(i).)

Tulare County Regional Center found Student eligible for early intervention services in 2018.  (20 U.S.C. §§ 1431, 1436(d); 34 C.F.R. § 303.344).  Student had physical, expressive communication, social and adaptive delays.  Student engaged in aggressive behaviors in his home and community settings such as hitting, kicking and banging his head.  In July 2018, Tulare City's special education local plan area, called SELPA, developed an Individualized Family Service Plan to support Student's family and Student's developmental needs.  The SELPA provided Student in-home applied behavioral analysis services, physical and occupational therapy services, and speech and language services.

ISSUE 1(C): FAILURE TO IMPLEMENT STUDENT'S IEP FOR THE 2019-2020
REGULAR SCHOOL YEAR, BEGINNING MARCH 13, 2020

Student asserts that Tulare City denied him a FAPE by failing to implement his IEP
during the 2019-2020 school year and extended school year.  In particular, Student
contends that Tulare City failed to provide in-person services for speech therapy,
physical therapy, individual aide support, and placement in a general education
intervention classroom, as called for in Student's IEP, thereby denying him a FAPE.

There is no dispute that Tulare City implemented Student's July 30, 2019 IEP prior
to the school closure caused by the COVID-19 pandemic.  Following the school closure,
Tulare City responds that it materially implemented Student's IEP through distance
learning in accordance with federal and state guidance.

Student's initial IEP dated July 30, 2019, was the operative IEP for the 2019-2020
school year.  (20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a) (2006); Ed. Code, § 56505,
subd. (d).)  Student was eligible for special education under the category of autism.
Student had deficits in mobility, attention to task, following directions and expressive
and receptive language.  The IEP contained seven annual goals for Student in the areas
of articulating words associated with pictures, responding to requests for preferred and
less preferred items, signing all done when finished with a task, staying on task for one
minute, following basic one-step instructions in the classroom environment, and
independently climbing play structures.

The July 30, 2019 IEP provided Student 15-minutes of individual speech and
language services, eight times monthly to support Student's speech and language goals.
The IEP provided Student direct physical therapy services 20-minutes two times monthly
to address Student's gross motor deficits, along with a ten-minute monthly consultation

between the physical therapist and classroom staff.  The IEP required one-on-one aide support during the school day when Student was not working with another adult, and a monthly one-hour consultation between Tulare City's Board-Certified Behavior Analyst and Student's aide.

Student had accommodations including allowing Student to work on preferred tasks, shortening the time Student worked on non-preferred tasks and use of a break card and area.  The IEP also offered Parent a one-hour consultation with Student's service providers every six to eight weeks.  A functional behavior assessment was conducted to determine Student's needs within the classroom setting.

The July 30, 2019 IEP team discussed the full educational spectrum, including placement in a general education preschool class, a special day class and a general education intervention class.  Parent wanted Student to benefit from a general education environment where he could model his typically developing peers.  The IEP team discussed with Parent that a special day class would have a smaller class size and more adult support for Student.  The IEP team believed Student would benefit from a smaller general education intervention placement, with a student to teacher ratio of nine to three, instead of the larger general education classroom, with approximately nineteen students and two teachers.  The IEP team, including Parent, determined Student's educational needs could be achieved satisfactorily in the regular educational setting.  (34 C.F.R. § 300.114(a)(2).)  The IEP called for Student to be placed in the smaller, general intervention class, called Intervention Class, for three days a week.

At hearing, Tulare City's witnesses, including Early Childhood Education Director Jennifer Marroquin, Director of Special Education Michelle Zavaleta, Intervention Teacher Pam Costa and Speech Therapist Karleen Lyons testified the Intervention Class was a general education class taught by a general education teacher with push-in

7

supports by IEP service providers, including Student's speech and language therapist. Approximately one-half of the students had IEPs, and the other one-half of the class was neurotypical.

Parent did not initially consent to the July 30, 2019 IEP.  The 2019-2020 academic school year began on August 13, 2019.  However, Parent did not enroll Student at that time.  On September 20, 2019, Student filed a due process complaint with OAH, Case number 2019090832 which the parties settled on November 2, 2019.  As part of the settlement, Student's program was changed from three to four days per week in the Intervention Class.  In addition, the IEP was amended to clarify Student's one-to-one aide would be trained in applied behavior analysis.

As soon as possible following the development of an IEP, special education and related services shall be made available to a student with exceptional needs in accordance with his IEP.  (34 C.F.R. § 300.323(c)(2); Ed. Code, § 56344, subd. (b).)  Where a student alleges the denial of FAPE based on the failure to implement an IEP, the student must prove that any failure to implement the IEP was material, which means the services provided to the child fell "significantly short of the services required by the child's IEP."  (*Van Duyn v. Baker School Dist. 5J* (9th Cir. 2007) 502 F.3d 811, 822 (*Van Duyn*).)

There is no statutory requirement of perfect adherence to the IEP, and minor failures to implement an IEP do not constitute a denial of FAPE.  "A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP."  (*Id.* at p. 815.)  In *Van Duyn*, the court determined the school district's failure to provide five hours of math tutoring per week out of the ten hours specified in the student's IEP constituted a material failure to implement the IEP.  (*Id.* at p. 823.)  A student is not required to prove

8

the district's failure to implement the IEP caused him to lose educational benefits.  (*Id.* at p. 822.)

Student's first day at Lincoln Elementary School was January 27, 2020, and his last day was February 25, 2020.  Student attended a total of eight days prior to the school closure on March 13, 2020, caused by the COVID-19 pandemic.  Student received his IEP related services in the Intervention Classroom.  Student was enrolled in the morning session between 8:15 to 9:45, a.m., four days per week.

Student raised no objection to implementation of the July 30, 2019 IEP from August 13, 2019 through March 13, 2020.  Student's issue is limited to implementation of his IEP from March 13, 2020 to June 9, 2020, and through extended school year.  During this time, California public schools were impacted as a result of the COVID-19 global pandemic.

## FEDERAL AND STATE GUIDANCE ON PROVIDING SPECIAL EDUCATION DURING THE COVID-19 PANDEMIC

On March 4, 2020, California Governor Gavin Newsom declared a State of Emergency in California as a result of the highly contagious coronavirus, referred to as the COVID-19 pandemic.

On March 12, 2020, the United States Department of Education Office of Special Education and Rehabilitative Services, known as OSERS, published guidance to states for educating children with disabilities during the COVID-19 pandemic.  (OSERS, March 12, 2020, *Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak* (OSERS Q & A), Answer to Question A-1.)  OSERS advised local educational agencies they would not violate the IDEA if they closed schools to slow or stop the spread of COVID-19 and did not provide educational

9

services to the general student population, then they would not be required to provide services to students with disabilities during that same time period.  (*Id.*, at p. 2, Answer A-1.)  Once school resumed instruction, the local educational agency was required to "make every effort to provide special education and related services to the child in accordance with the child's IEP." (*Ibid.*)

OSERS acknowledged that local educational agencies might not be able to provide FAPE to some students through educational programs developed in response to COVID-19 and would need to evaluate whether those students needed compensatory education as a result.  "There may be exceptional circumstances that could affect how a particular service is provided . . "[A]n IEP team . . . would be required to make an individualized determination as to whether compensatory services are needed under applicable standards and requirements." (*Id.*, at p. 2, Answer A-1.)

On March 13, 2020, California Governor Gavin Newsom issued Executive Order N-26-20 which authorized school districts to continue educating students to the extent feasible through distance learning and/or independent study.  The Order directed the California Department of Education, referred to as CDE, to issue guidance on how to ensure students with disabilities received a FAPE.  In response, CDE advised local educational agencies to "do their best in adhering to IDEA requirements . . . to the maximum extent possible."  CDE encouraged local educational agencies to "consider ways to use distance technology to meet these obligations." (CDE, *Special Education Guidance for COVID-19, COVID-19 School Closures and Services to Students with Disabilities* (March 20, 2020) (CDE March 20, 2020 Guidance).)

On March 19, 2020, Governor Newsom issued Executive Order N-33-20, which directed all California residents "to immediately heed the current State public health directives," including the requirement "to stay home or at their place of residence except

as needed to maintain continuity of operations of the federal critical infrastructure sectors." See Cal. Exec. Order N-33-30 (Mar. 19, 2020).) Further, the California State Public Health Officer issued a list of designated "essential" workers who were allowed to leave their homes to support specified critical infrastructure sectors, which included workers teaching at "public and private . . . K-12 schools," but only for "distance learning." As recently noted by the Ninth Circuit, Executive Order N-33-20 remained in effect until June 11, 2021, and California residents were prohibited from leaving their homes except to the extent State officials provided an exception. "[T]he ability to operate schools (or anything else) turned on what sort of permission State officials granted back either in the form of rules governing 'critical infrastructure sectors' or some exception to the stay-at-home order." (*Brach v. Newsom* (9th Cir. 2021) 6 F.4th 904, 911.)

On March 21, 2020, the U.S. Department of Education's Office for Civil Rights, called OCR and OSERS issued supplemental guidance in response to reluctance by some school districts to provide any distance instruction because they believed that federal disability law presented insurmountable barriers to remote education. Recognizing that "educational institutions are straining to address the challenges of this national emergency," OCR and OSERS assured school districts they should not opt to close or decline to provide distance instruction. (OCR AND OSERS, *Supplemental Fact Sheet Addressing the Risk of COVID-19 in Preschool, Elementary and Secondary Schools While Serving Children with Disabilities*, (March 21, 2020), at p. 1) (OSERS Supplemental Fact Sheet).) "To be clear: ensuring compliance with [the IDEA] . . . should not prevent any school from offering educational programs through distance instruction". (*Ibid*.) "[T]he provision of FAPE may include, as appropriate, special education and related services provided through distance instruction provided virtually, online, or telephonically." (*Id*, at pp. 1-2.) OSERS emphasized that "federal disability law allows for flexibility in

determining how to meet the individual needs of students with disabilities" and the "determination of how FAPE is to be provided may need to be different in this time of unprecedented national emergency." (*Ibid.*)  OSERS encouraged parents and educators to collaborate creatively to meet the needs of students with disabilities, and to consider practices, "such as distance instruction, teletherapy . . [and] meetings held on digital platforms," and noted "there are low-tech strategies that can provide for an exchange of curriculum-based resources, instructional packets, projects and written assignments." (*Ibid.*)

The Department of Education acknowledged during the national emergency schools may not be able to provide all services in the same manner as typically provided, including some in-person services such as hands-on physical therapy, occupational therapy, or tactile sign language educational services.  (*Ibid.*)  It advised that many disability-related modifications, and services, may be effectively provided online, including "for instance, extensions of time for assignments, videos . . ., accessible reading materials, and many speech or language services through video conferencing." (*Ibid.*)  The Department of Education encouraged parents and educators to collaborate creatively to meet the needs of students with disabilities, and to consider practices, "such as distance instruction, teletherapy . . [and] meetings held on digital platforms," and noted "there are low-tech strategies that can provide for an exchange of curriculum-based resources, instructional packets, projects and written assignments." (*Ibid.*)

## TULARE CITY HAD NO DUTY BETWEEN MARCH 13, 2020 AND MARCH 20, 2020 TO PROVIDE STUDENT'S IEP SERVICES

Tulare City closed its doors for instruction on March 13, 2020 in response to Governor Newsom's declaration of a state of emergency.  Tulare City did not provide

instruction to its preschool students, disabled or non-disabled, for the week following the school closure.  Tulare City began distributing At-Home Learning Packets to pre-school students, including Student, the week of March 23, 2020.

The Department of Education advised school districts in its March 2020 guidance that school districts that closed to all students because of the pandemic did not violate the IDEA by closing to special education students.  (*Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak*, *supra*, p. 2, Answer A-1).  The Department of Education's guidance was consistent with the Ninth Circuit's decision in *N.D. v. Hawaii Dep't of Educ.* (9th Cir. 2010) 600 F.3d 1104, 1116-1117 (*N.D.*), which upheld a district court's denial of a motion by special education students to enjoin the state's shutdown of all schools on Fridays during a fiscal emergency.  The Ninth Circuit rejected the students' arguments that ceasing services owed to them under their IEP's constituted a change of placement and violated IDEA's stay put rule.  The Ninth Circuit explained, "Congress did not intend for the IDEA to apply to system wide administrative decisions" and "[a]n across the board reduction of school days such as the one here does not conflict with Congress's intent of protecting disabled children from being singled out."  (*Id.* at p. 1116.)

Student failed to establish that Tulare City had a duty to provide services to him whiles its schools were closed to all students.  Therefore, Student did not prove that Tulare City denied him a FAPE for the period March 13, 2020 through March 20, 2020.

## TULARE CITY FAILED TO MATERIALLY IMPLEMENT STUDENT'S IEP FROM MARCH 23, 2020, THROUGH THE END OF THE REGULAR SCHOOL YEAR

Student contends that during distance learning following the COVID-19 pandemic, Tulare City was required to provide him in-person services by his behavior

aide, speech and language therapist and physical therapist.  He further contends Tulare City should have provided Student an in-person aide trained in applied behavior analysis to assist him in completing the At-Home Work Packets.  He also argues Tulare City failed to provide all the related services his IEP required.

Tulare City contends the At-Home Learning Packets provided to Student, together with individualized speech and language and physical therapy assignments and consultations between Parent and Student's teacher, speech and language therapist, physical therapist and Board-Certified Behavior Analyst provided Student a FAPE, and that it was not required to provide in-person services.

Although it was not possible to implement Student's IEP as written, Tulare City was obligated to offer a temporary placement and program that "closely approximated" Student's last educational placement.  (*Ms. S. v. Vashon Island School Dist.* (9th Cir. 2003) 337 F.3d 1115, 1131 (superseded on other grounds by statute).)  The federal and state guidance provided to local educational agencies made no change to existing law for providing students a FAPE.  CDE encouraged local educational agencies to continue providing special education and related services as outlined in a student's IEP through a distance learning model.  (CDE March 20, 2020 Guidance, Frequently asked Question 1.)  CDE acknowledged that the unprecedented COVID-19 pandemic might lead to learning being provided that did not mirror the offer of FAPE in a student's IEP.  CDE counseled in such a situation, "[O]nce the regular school session resumes," [districts] should plan to make an individualized determination, in collaboration with the IEP team, regarding whether or not compensatory services may be needed for a student." (*Ibid.*)  While CDE guidance is not binding on school districts, it is instructive when considering a school district's obligations during this time period.

Tulare City attempted to deliver distance learning and instruction to Student during the COVID-19 school closure.  Tulare City sent a prior written notice to all parents on March 30, 2020.  The notice informed parents of special education students that special education and related services would be delivered during the school closure.  Activities, resources and weekly lesson plans would be provided virtually or through printed materials.  Service providers would contact parents weekly and schedule virtual office visits, visual supports and daily schedules to implement at home.  The notice included parents' rights and procedural safeguards.  Student's Parent received this general notice.  Tulare City remain physically closed to all students through the end of the 2019-2020 regular and extended school year.

AT-HOME LEARNING PACKETS DURING DISTANCE INSTRUCTION

"Special education" is instruction specially designed to meet the unique needs of a child with a disability.  (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39(a)(1) and (b)(3); Ed. Code, § 56031(a).)  The IDEA defines specially designed instruction as adapting, as appropriate to the needs of the eligible child, the content, methodology, or delivery of instruction to address the unique needs of the child and to ensure access of the child to the general curriculum.  (34 C.F.R. § 300.39(a)(1).)  During the school closure, Tulare City was obligated to provide Student instruction designed to meet his unique needs.

Early Childhood Education Director Marroquin testified at hearing regarding the distance learning program created and implemented for preschool students for the period March 23, 2020 through June 9, 2020, the last day of the 2019-2020 regular school year.  Upon school closures, Tulare City posted learning activities on its website.  Tulare City also sent parents communications through Aeries, its district-wide communication platform.

Beginning the week of March 23, 2020, Tulare City provided At-Home Learning Packets for all preschool students.  The At-Home Learning Packets were distributed bi-weekly and were designed to cover two weeks of learning.  The packets were developed using the curriculum and lesson plans used in the preschool classroom.  Each packet contained parental instructions and a proposed daily schedule with suggested lengths of time for each activity.  The At-Home Learning Packets were designed to approximate the schedule and learning activities within the pre-school classroom.  For example, a student could engage in circle time activities, such as music and movement, for 20 minutes, work on a structured activity from the At-Home Learning Packet for 45 minutes, participate in carpet time for 15 minutes and engage in outdoor play for 30 minutes.

The At-Home Learning Packets targeted skills in the areas of language, math, shapes, colors, pre-reading skills, and fine and gross motor skills.  They contained appropriate age level book ideas, words for songs to be sung in circle time, and pictures of objects to cut out and count or sort.  The pictures were printed in colored ink and distributed to the parents at a designated pick-up location every other Friday. Marroquin explained the activities were play based and designed to be completed three to four times weekly to reinforce concepts.  She clarified the activities did not have to be done all at one time but could be spread out over the course of the day.

Parent testified at hearing.  Parent found working with Student in the home setting on the At-Home Learning Packets extremely challenging.  Student displayed mood dysregulation and aggression towards Parent.  He engaged in self-injurious behavior, such as hitting himself with his alternative augmentative communication device.  Student received clinic based non-educationally related applied behavior analysis services through Parent's private medical insurance from approximately

16

January 2020 through mid-March 2020.  Following the school closures in mid-March 2020, Student's private in-home applied behavioral analysis services were temporarily discontinued during the COVID-19 pandemic, which contributed to Student's mood dysregulation.  Parent created an enriching learning environment for Student.  She bought a desk, purchased preferred items Student could choose from as reinforcers, prepared a visual schedule, created a break area with a bean bag, and used a variety of tangibles.  Parent had little instructional control over Student.  When she made demands on Student, he engaged in maladaptive behaviors, such as eloping and engaging in self-injurious behavior and aggression towards Parent.  Parent believed Student received little or no benefit from the At-Home Learning Packets.

At hearing, Student did not offer evidence regarding how many minutes per day Parent worked with Student on the At-Home Learning Packets, or how long Student tolerated working on the packets before he exhibited maladaptive behaviors.  No evidence was presented by Tulare City that it provided online interactive instruction, pre-recorded videos, or any other type of instruction, nor that it was unfeasible to do.

Tulare City's Board-Certified Behavior Analyst Noelle Verduzco made numerous attempts following the school closure through the end of the regular school year and extended school year to offer Parent behavior consultations, but Parent was generally nonresponsive.  Tulare City's speech therapist Lyons also reached out to Parent on multiple occasions to determine if Parent had questions about the At-Home Work Packets.  Parent generally was non-responsive to these communications.  However, at an April 29, 2020 IEP team meeting Parent reported that Student was experiencing regression in speech and behaviors.

Evidence showed that Tulare City attempted to deliver distance learning instruction and services to Student during the COVID-19 school closure during the

17

2019-2020 school year.  It established the At-Home Work Packets were designed to mirror Student's preschool classroom and were an appropriate distance learning option for typically developing preschool aged children.  The use of At-Home Work Packets was consistent with the type of alternative distance learning methods recommended in the Department of Education's March 21, 2020 guidance.

However, the preponderance of the evidence established the At-Home Work Packets were not a close approximation to Student's IEP placement.  All of the witnesses who were familiar with Student testified Student required the assistance of a behaviorally trained aide to assist him in maintaining attention to task and avoid eloping.  Tulare City did not establish how the delivery of instruction through the At-Home Work Packets addressed Student's unique behavioral needs and ensured his access to the general curriculum.  (34 C.F.R. § 300.39(a)(1).)

Parent reported to the IEP team she had difficulty working with Student and his negative behaviors increased.  No evidence was presented Tulare City considered alternative modes of delivery, such as virtual check-ins by Student's general education teacher or virtual video sessions with Student.  While it was not feasible to provide in-person instruction as requested by Student because of dangers attributable to the COVID-19 pandemic and a lawful state-wide order closing schools, Tulare City failed to show that it was not feasible to more closely approximate Student's IEP through virtual instruction.

In sum, evidence, including Parent's testimony, showed that the At-Home Work Packets, could not, without additional remote support, be effectively implemented for Student.  Therefore, Student proved Tulare City failed to implement Student's IEP from March 23, 2020, through June 9, 2020.

18

SPEECH AND LANGUAGE SERVICES

Student's July 30, 2019 IEP provided Student 15-minutes of individual speech and language services, eight times monthly to support Student's speech and language goals. Tulare City provided no direct speech and language services to Student from March 23, 2020 through the end of the regular school year.  Tulare City contends it created written speech and language assignments that it distributed to Student bi-weekly with the At-Home Learning Packets.

Tulare City argues it was not feasible to offer direct speech and language services during the pandemic, and that it closely approximated Student's services by providing speech and language assignment sheets.  Speech therapist Lyons testified at hearing. Lyons created speech assignment sheets that aligned with each of Student's speech goals and were designed to be implemented by Parent in the home setting.  For example, Student's expressive language goal required Student to respond verbally, with his alternative augmentative communication device or a picture icon when asked a question.  The assignment sheets contained instructions and activities for Parent to use with Student.  The speech assignment sheets were included in Student's bi-weekly At-Home Learning Packets.  Lyons communicated to Parent that Parent could contact her by telephone or text if she had any questions.

Lyons did not provide any direct sessions to Student between March and June 2020.  Lyons did not deliver to Student any virtual instruction as an alternative to one-to-one therapy or clarify why it was not feasible to provide speech instruction remotely. Student's speech services were limited to the written packets with activities and instructions and consultations between Parent and Lyons.

During a May 5, 2020 IEP team meeting, Lyons reported that Student had met the benchmark for his annual articulation goal and made progress towards his receptive language and expressive language goal.  However, Lyons had not provided direct services to Student since late February 2020.  On April 29, 2020, Parent reported to the IEP team that Student was making different noises and the clarity of his speech had decreased.  Student proved by the preponderance of the evidence the speech worksheets were not the equivalent of direct speech and language services to which he was entitled under the July 30, 2019 IEP.  Student met his burden of proving Tulare City denied Student a FAPE by failing to provide speech and language services from March 23, 2020 through June 9, 2020.

PHYSICAL THERAPY SERVICES

Student's July 30, 2019 IEP provided Student direct physical therapy services 20 minutes two times monthly to address Student's gross motor deficits.  It also required the physical therapist to consult for ten-minutes monthly with Student's classroom staff.

Parent testified Student received no physical therapy from Tulare City following the school closure through the end of the 2019-2020 school year.  Neither party submitted testimony or evidence from a physical therapist to describe the efficacy of the physical therapy services that was provided to Student during the school closure.  However, Lyons testified that Student's physical therapy services were implemented by providing Parent an activity worksheet which was sent home with Student's At-Home Learning Packet on March 23, 2020.  Lyons explained the assignment sheet was created by a physical therapist and contained activities and websites resources.  Examples of activities included having Student practice walking up and down on a curb and creating an indoor obstacle course.  No evidence was presented regarding how these activities aligned with Student's goals in his IEP, or that a physical therapist reached out to Parent

20

by telephone or email to address any parental concerns or to provide virtual physical therapy session.

Student met his burden of proving Tulare City did not implement his IEP by failing to provide Student physical therapy services following the school closure through the end of the regular 2019-2020 school year.

## ISSUE 1(A): BEHAVIORAL SUPPORTS FOR THE 2019-2020 SCHOOL YEAR AND EXTENDED SCHOOL YEAR

Student contends Tulare City denied him a FAPE by failing to provide him aide support during the school closure.  Student argues more specifically Tulare City should have provided Student in-person aide support.

Tulare City contends it was unable to provide in-person aide support during the COVID-19 pandemic and it offered Parent consultations and coaching by its Board-Certified Behavior Analyst.  It asserts its offer of parent consultations and coaching closely approximated Student's IEP.

Tulare City was required during the school closure to deliver Student's educational program to the extent feasible through options such as distance learning. (*R.F. Frankel v. Delano Union School Dist.* (E.D. Cal. 2016) 224 F.Supp.3d 979, 985; *Vashon Island School, supra*, 337 F.3d at 1131.)  Further, Tulare City was required to provide appropriate modifications or accommodations based on Student's individualized needs.

In the case of a child whose behavior impedes his learning or that of others, the IEP must consider, when appropriate, "strategies, including positive behavioral interventions, strategies, and supports to address that behavior.  (20 U.S.C.

21

§ 1414(d)(3)(B)(i); 34 C.F.R. §  300.324(a)(2)(i); Ed. Code, §  56341.1, subd. (b)(1).)

Student's July 30, 2019 IEP, as amended, provided Student one-to-one aide support by

an aide trained in applied behavior analysis during the school day when Student was not

working with another adult.  The IEP required Tulare City's Board-Certified Behavior

Analyst to consult with Student's behavior aide one-hour monthly.  The IEP provided

Parent with a one-hour consultation with Student's service providers every six to eight

weeks.  The IEP contained accommodations including allowing Student to work on

preferred tasks, shortening the time Student worked on non-preferred tasks and use of

a break card.

## NO EXCEPTIONAL CIRCUMSTANCES EXISTED REQUIRING TULARE CITY TO PROVIDE AT-HOME OR IN-PERSON AIDE SUPPORT

Student contends that Tulare City should have provided in-home aide services to

Student because Student was exhibiting self-injurious and aggressive behavior at home.

Tulare City argues it was prohibited from providing in-person aide services based

upon Governor Newsom's  stay-at-home order, and further that exceptional

circumstances did not exist for providing in-person services.

The services provided in an IEP are tied to a particular location.  An IEP must

include "the anticipated frequency, location, and duration of services . . ."  (20 U.S.C.

§ 1414(d)(1)(A)(i)(VII).)  Special education and related services provided in the home are

limited to students for whom the IEP team recommends home instruction.  (5 Cal. Code

Regs. § 3051.4.; *C.L. v. Lucia Mar Unified School District* (C.D. Cal. Jan. 9, 2014), 2014 WL

117339, affirmed by *C.L. ex rel. V.L. v. Lucia Mar Unified School District* (9th Cir. 2016)

646 Fed. Appx. 524 [nonpub. Opn.] [IDEA did not require a school district to transplant

the entirety of the services offered in student's IEP which contemplated in-school

instruction to home environment during interim period mother and IEP team were considering changes to student's educational placement].)

A recent OAH decision determined an IEP's identification of the "general education classroom" for a student's specialized academic instruction was exclusive and did not require the services to be done anywhere except in the physical classrooms on school campus. (*Parents on behalf of Student v. Ventura Unified School District*, (June 18, 2021) OAH No. 2021030296, pp. 5-6.) Although this decision is not binding, it is persuasive. (Cal. Code Regs., tit. 5, § 3085.) Further it aligns with the Ninth Circuit's holding in *C.L.*, *supra*, 646 Fed. Appx. 524.

Student's July 30, 2019 IEP stated his one-to-one supervision would take place in the classroom during the school day when Student was not being supervised by another adult. The IEP did not provide Student's aide services would be provided in the home.

Student offered no legal authority that the one-to-one aide services were required to be provided outside the classroom, such as in a home setting. Student argues however, Tulare City should have found exceptional circumstances existed in accordance with CDE's April 9, 2020 guidance to allow in-person instruction based upon Student's aggressive and self-injurious behaviors. CDE's guidance is instructive but is not binding legal authority. (See *Cyrus Csutoras v. Paradise High School* (9th Cir. September 7, 2021, No. 19-17373, D.C. No. 2:16-cv-02210-KJM-DMC) 2021 WL 4057710.)

In its April 9, 2020 guidance, CDE advised, "in some exceptional circumstances, local educational agencies may need to provide certain supports and services to individual students in-person in order to maintain students' mental/physical health and safety for the purpose of supporting the student in accessing the alternative options for

23

learning being offered (e.g., distance learning).  With that said, alternative service delivery options should seek to comply with federal, state and local health official's guidance related to physical distancing, with the goal of keeping students, teachers and service providers safe and healthy as the primary consideration." (California Department of Education, *Special Education Guidance for COVID-19. COVID-19 School Closures and Services to Students with Disabilities* (April 9, 2020).)  CDE advised in-person services could be provided only in "exceptional circumstances after an individualized determination." (*Ibid.*)

The IDEA and the Education Code, their implementing regulations and case law interpreting these statutes, govern this proceeding.  The IDEA does not require a school district to address behavioral problems that occur outside of the school when the student demonstrates educational progress in the classroom. (*San Rafael Elementary School Dist. v. California Special Education Hearing Office (N.D. Cal. 2007) 482 F.Supp.2d 1152, 1161-1162(San Rafael), citing County of San Diego v. California Special Education Hearing Office* (9th Cir. 1996) 93 F.3d 1458.)  The focus of an IEP is on the student's performance within the academic setting. (*Id.*, at pp. 1160-1161.)

Recently, the United Stated District Court for the Central District of California denied a student's request for a temporary restraining order and rejected her request for in-person IEP services during the COVID-19 pandemic. (*E.M.C. v. Ventura Unified School District* (C.D. Cal. October 14, 2020 No. 2:20-CV-09024-SVW-PD) 2020 WL 7094071 (*E.M.C.*).)  Like Student here, the *E.M.C.* student experienced difficulties with distance learning and alleged she regressed academically and behaviorally.  Relying on the Ninth Circuit's decision in *N.D.*, the court reasoned even if the student's IEP provided for in-person services, the program had been modified by the statewide public health restrictions prohibiting in-person instruction. (*E.M.C., supra*, at *6.)  The court rejected

student's argument that restrictions on in-person learning in counties on the statewide monitoring list did not excuse a school district from its obligation to provide in-person IEP services.  The court found CDE's April 9, 2020 guidance "carved out a more limited exception for in-person IEP services after 'an individualized determination is made that a student needs service or supports in-person to maintain their mental/physical health and safety for the purpose of supporting the student in accessing the alternative options for learning being offered'."  (*Id.* at p. 6.)

The court's reasoning in *E.M.C.* is instructive.  Student's IEP was modified by the statewide public health restrictions prohibiting in-person instruction.  (*Ibid.*)  Student's IEP team did not make an individualized determination following the school closure that in-person services were appropriate to maintain Student's mental or physical health and safety to support his access to his educational program.

The preponderance of the evidence did not prove the IEP team should have made such a determination based upon the facts known to it at the time.  At hearing, Student presented only the testimony of his Parent and the arguments of counsel.  No expert testified in-person services were necessary to maintain Student's mental or physical health and safety.  Parent offered hearsay evidence of a recommendation by Student's physician Student should not participate in distance learning.  Hearsay "shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions."  (Cal. Code Regs., tit. 5 § 3082.)

No witness, other than Parent, observed Student engage in aggressive or self-injurious behaviors during virtual learning.  At hearing, Parent's recounted more extreme behaviors than she relayed to the IEP team in the meetings held to develop the April 29, 2020 IEP.  She testified Student engaged in extreme behaviors such as biting through his lip, pinching himself and other conduct resulting in a black eye and bloodied nose.

Student's closing brief mentioned Student was taken to the emergency room on several occasions, although this evidence was not offered at hearing.  Parent appeared evasive and uncomfortable when questioned about what information she communicated to the IEP team about the severity of Student's behaviors, and when she relayed this information.  She hesitated, appeared nervous and changed her testimony.  She initially claimed she could recall, but then stated she believed she relayed this to Speech Therapist Lyons.

In her testimony, Lyons confirmed Parent told her about Student's regression in his speech skills and that he engaged in self-harm and property destruction in a telephone conversation on April 20, 2020.  However, Lyons did not recall Parent describing the severe behaviors Parent testified to during hearing.  Parent did not report Student engaged in any serious incidents of self-harm or aggression at the April 29, 2020 IEP team meeting only nine days later.

Student's counsel played a portion of an IEP team recording from May 5, 2020 in which Student could be heard whining in the background.  Parent testified Student was banging his head against the door at the time.  None of the IEP team members, including Parent, stopped the meeting for Parent to attend to Student.  Nor did Parent tell the IEP team, nor was any evidence offered, the IEP team was aware at the time Student was banging his head.

Student's private Board-Certified Behavior Analyst, Amanda Delgado, testified at hearing.  Delgado was an experienced Board-Certified Behavior Analyst and had substantial experience working with children with autism.  Delgado provided in-person applied behavior analysis services to Student in the clinical setting between January and June, 2020.  Delgado attended the IEP team meetings for development of the April 29, 2020 IEP, with the exception of the June 9, 2020 meeting.

Delgado explained prior to the school closure Student engaged in passive noncompliance.  He had difficulty in circle time and during transitions between activities. Following his return to clinic-based services on April 20, 2020, however, Student engaged in more frequent acts of noncompliance and elopement.  Student displayed more aggression towards adults and peers and engaged in spitting and property destruction.

Delgado did not offer specifics about the type of conduct she observed or how frequently she observed them and confirmed she had not observed enough of these behaviors to formally track their frequency.  She also testified she was placing more demands on Student at the time to increase his sustained attention, such as sitting in a chair, and making requests which can lead to an increase of maladaptive behaviors. Delgado did not testify to any acts of serious aggression or self-injurious behavior which threatened Student's physical or mental health or safety, or that of others.

Although Parent undoubtedly struggled with distance learning and Student's behavioral challenges, Student did not prove Tulare City should have found exceptional circumstances existed requiring Tulare City to provide in-person aide support during the COVID-19 pandemic.

Student also offered no evidence his behaviors at home affected his academic progress.  (*San Rafael, supra,* 482 F.Supp.2d at p. 1162.)  Prior to the school closure, Student was progressing commensurate with other preschool children initially starting preschool.  Director Marroquin explained Student's year end progress report dated February 28, 2020, was based on the Desired Results Developmental Profile issued by the California Department of Education.  This tool evaluates preschool aged children in various domains, including attention to maintenance, self-comforting, and letter and word knowledge.  Director Marroquin persuasively explained Student's attention to

maintenance, meaning his ability to maintain attention to a task on his own or with the assistance of an adult, and his ability to self-comfort were within the norm of three-years starting preschool.  Student's knowledge of letters and words, spatial relationships, self-control, engagement and persistence were relative areas of strength.  Marroquin genuinely explained Student's scores were appropriate and within the expected development range.

Parent's testimony aligned with Marroquin.  Parent described in detail to the April 29, 2020 IEP team the preacademic skills Student had mastered, including counting, knowledge of the alphabet, and identifying shapes and colors.  No evidence was offered suggesting Student's behaviors impacted his preacademic skills.  For this additional and independent reason, Student did not prove exceptional circumstances existed requiring Tulare City to provide in-person services.

## TULARE CITY'S OFFER OF PARENT COACHING AND CONSULTATIONS

Tulare City contends it offered Parent coaching and consultations to address Student's behaviors during distance learning.  Tulare City argues its offer of Parent coaching and consultation was a close approximation to Student's IEP behavioral supports.  Student contends he required in-person aide support to access his educational program.

Tulare City's Board Certified-Behavior Analyst Verduzco testified at hearing. Verduzco was an experienced Board-Certified Behavior Analyst.  She held a master's degree in teaching and a bachelor's degree in child development.  Verduzco worked for Tulare City from 2018 through 2020.  She had substantial experience working with children and adults diagnosed with autism.  She conducted a functional behavior assessment of Student in January and February 2020 and developed a behavior

intervention plan to address Student's escape and avoidance behaviors in the school setting.  Verduzco was familiar with Student based on her interactions with him while conducting the functional behavior assessments and attending all IEP team meetings.

Parent reported to Verduzco in February 2020 that Student exhibited high rates of aggressive and self-injurious behaviors within the home and community settings. These behaviors included hitting and kicking, pulling hair, biting and throwing items. Student would engage in self-injurious behaviors such as making forceful contact between his hand and chin, lips, feet, face or head, forcefully closing his mouth on his skin, and hitting his head on hard surfaces.

Between January 27, 2020 through February 25, 2020, Student did not exhibit aggressive or self-injurious behaviors in the school setting.  During this same period teacher and staff reported Student's inability to attend to non-preferred tasks for extended periods of time.  Student engaged in escape or avoidance behaviors 76.5% of the time during non-preferred lengthy tasks, such as carpet time, music time and book time.

Verduzco described Student's target behavior as "escape" and "avoidance". Verduzco summarized antecedent and consequences of Student's escape and avoidance behavior.  Verduzco defined the behavior as removing or denying Student access to a non-preferred task, or presenting a non-preferred task, such as sitting at the carpet. Student would run or crawl away from the assigned instructional area, vocally say, "No!" or "No, no, no!", and place both his hands on his hips with a frown and furrowed brow. Verduzco described the desired alternative behavior as tolerating non-preferred or lengthy task demands without exhibiting the target behavior.

Verduzco conducted a number of direct assessments which reflected Student's behavioral deficits in the school setting were escape and avoidance.  The assessments did not show Student demonstrated tantrums, self-harm or aggressive behaviors in the classroom environment.  Verduzco's report included a goal of reducing Student's escape and avoidance behaviors by 25% or less across ten consecutive days across various non-preferred lengthy tasks, such as circle time, book time, and center transition time.

Verduzco persuasively opined that Tulare City attempted to offer Parent behavior skills training to assist her in working at home with Student.  Behavior skills training is a method used to instruct staff, parents and caretakers on teaching a behavior or skill to a student.  Verduzco persuasively explained behavior skills training is a research and evidenced method using instruction, modeling, rehearsal and feedback.  Verduzco's substantial experience as a Board-Certified Behavior Analyst, her familiarity with Student based upon her functional behavior assessment, and her careful testimony rendered her opinions persuasive.  Verduzco's testimony was afforded great weight.

Verduzco reached out to Parent on numerous occasions between March 24, 2020 and June 9, 2020 to offer Parent coaching and support.  Verduzco documented her contacts with Parent on Student's case log maintained by Tulare City.  Verduzco spoke with Parent on March 24, 2020, and reviewed Student's classroom schedule.  Verduzco provided recommendations for increasing Student's attention during non-preferred tasks.  Verduzco reached out to Parent on at least four occasions in April to schedule a behavior consultation but received no response.  Verduzco offered Parent additional behavior training at the May 26, 2020 IEP team meeting, in a voicemail on May 26, and in an email on May 27.  Parent responded on May 27, 2020, more than two months after Verduzco's initial outreach, and advised she was interested in participating in a parent

training.  Parent participated in a virtual parent behavior training module on June 5, 2020.

Student offered no expert opinion testimony rebutting Verduzco's opinion that behavior skills training to Parent would provide some benefit to Student.  (*Rowley, supra*, 458 U.S. at p. 207.)  As a result, Verduzco's expert opinion was unrefuted.

In addition, the preponderance of the evidence proved Student made progress on his July 30, 2019 IEP behavior goals.  The IEP team reviewed Student's progress on his behavior goals at the May 5, May 13 and June 9, 2020 IEP team meetings.  The IEP team considered information provided by Parent and Board-Certified Behavior Analyst Delgado.  The IEP team replaced the goal of taking a break with a new goal of increasing tolerance to aversive conditions to decrease his escape and avoidance behaviors.  Student made some progress on his attention to task goal as of March 2020 by attending to task for one minute or longer with no more than four prompts in four out of five opportunities, following single step directions and requesting a break.

Tulare City established that the behavior skills training with Parent was a close approximation to the one-to-one behavior aide contained in Student's IEP.  Student offered no countervailing evidence that the coaching and support was not a close approximation of Student's behavioral support services.  Therefore, Student failed to meet his burden of proving Tulare City denied him a FAPE by failing to provide Student appropriate behavior support in order for Student to make meaningful progress on his behavior goals.  (*Van Duyn, supra*, 502 F.3d at pp. 821-823.)

## ISSUE 1(D): FAILING TO OFFER ADEQUATE EXTENDED SCHOOL YEAR SERVICES DURING THE 2019-2020 SCHOOL YEAR

Student contends Tulare City denied him a FAPE by failing to offer adequate extended school year services.  More specifically, Students alleges Student was unable to benefit from extended school year services delivered to him through a distance learning and parent coaching model and required in-person services and aide support.

Tulare City contends it provided adequate extended school year services through the distance learning and parent coaching model, but that Parent declined to make Student available for all of the services.

Under the IDEA, schools are required to provide extended school year services as necessary in order to provide a child with a FAPE.  (34 C.F.R. §§ 300.309(a) and 300.106(a) (2006); Ed. Code, § 56345, subd. (b)(3).)  IEP team determinations regarding extended school year services are prospective and not intended to make up for past denials of FAPE.

In California, extended school year services shall be provided for each pupil with exceptional needs who requires special education and related services in excess of the regular academic year.  (Cal. Code Regs., tit. 5, § 3043; see also 34 C.F.R. § 300.106; Ed Code, § 56345, subd. (b)(3); *N.B. V. Hellgate Elementary School Dist.* (9th Cir. 2007) 541 F.3d 1202, 1209-1210.)  The standard for determining whether extended school year services are available is whether the student's disabilities are likely to continue indefinitely or for a prolonged period, and interruption of the pupil's educational programming may cause regression, when coupled with limited recoupment capacity, rendering it impossible or unlikely that the pupil will attain the level of self-sufficiency

and independence that would otherwise be expected in view of his or her handicapping condition." (Cal. Code Regs., tit. 5, § 3043.)

The IEP team discussed Student's eligibility for extended school year services at the May 21, 2020, and June 9, 2020 IEP team meetings.  Parent expressed her concerns about Student's regression in speech skills and behaviors.  The IEP team considered information shared by Parent and Board-Certified Behavior Analyst Delgado about Student's behavioral regression in the clinical setting.  The IEP team determined extended school year services were necessary to prevent regression.

The IEP team proposed a four-week program, Monday through Thursday from 8:30 a.m. to 9:00 a.m. daily starting June 15, 2020 and continuing through July 10, 2020.  The program would be delivered through a distance learning model using a virtual platform and Parent coaching.  The offer included 30-minutes of weekly speech and language services, 30-minutes of weekly physical therapy services, 30-minutes of weekly occupational therapy services, 45-minutes weekly behavior intervention services through Parent training, and 30-minutes weekly consultation with Parent to review the At-Home Distance Learning Packets.  Parent consented to the April 29, 2020 IEP on June 16, 2020.

Speech Therapist Lyons scheduled four virtual speech lessons with Parent for Student during the extended school year.  Lyons provided three speech therapy sessions to Student, and Parent did not log in to one of the sessions.  Lyons documented the sessions in Student's service provider case log.  At hearing, Lyons described the sessions and how she was able to coach Parents on how to elicit expressive language from Student.  For example, Parents could give Student a phrase such as, "jump high" and when he repeated the phrase, they would allow him to jump again.  Parents were successful in using this model with Student.  Lyons also spent time speaking with Parent about Student's progress.

Lyons worked directly with Student at the next session on three separate activities for approximately twenty-five minutes.  Student initiated breaks by leaving the screen but was redirected back by Parent.  Student was able to remain attentive to each task for approximately five to six minutes.

Student was attentive and focused at the third session.  He attended to task for about eight minutes before requesting a break.  He left the table at one point, and Parent redirected him back shortly.  Lyons credibly explained that Student did not leave the screen for more than two minutes and was easily redirected back by Parent.  Lyons did not observe any tantrums, self-injurious behavior or aggression towards Parent.

Lyons opined at hearing that Student's skills had improved since she last worked with him before school closures.  He was making three-to-four-word utterances with minimal prompting.  He attended to a variety of activities.  Student's sound quality had improved.  For example, when Student spoke Lyons could hear the "m" sound at the end of words ending with "m".  Lyons observed that Parent was positive and encouraging to Student.  When Student left the screen Parent would use appropriate prompting to encourage him to return.  Lyons reported to the IEP team at the August 12, 2020 IEP amendment team meeting about the success Student had with the virtual speech and language sessions.  Based on her experience, Lyons opined Student made progress in the virtual sessions.  Student failed to present testimony by a speech therapist or persuasive evidence to rebut Lyon's testimony.  For these reasons, Student failed to show by a preponderance of the evidence that Tulare City denied him a FAPE by failing to provide speech therapy during the extended school year.

Dominique Niccoli-Messchaert was a physical therapist for the Tulare County Office of Education.  She held a master's degree and doctorate in physical therapy.  She held a California Physical Therapy License and was certified by California Children's

Services.  She was a physical therapist since 1994.  She worked with children with autism for over 20 years.  Niccoli-Messchaert had experience using parent coaching with parents of young children in early intervention programs.  Niccoli-Messchaert explained how she implemented a virtual parent coaching session.  She demonstrated a targeted skill to the parent.  The parent modeled Niccoli-Messchaert's actions with their child. Parents filmed their child practicing a skill, which Niccoli-Messchaert reviewed and provided feedback to the parents.  She opined that this model is effective because it allows a parent to continue practicing skills with the child on a regular basis.  Niccoli-Messchaert persuasively testified at hearing in support of Tulare City.

Niccoli-Messchaert provided virtual extended school year physical therapy sessions to Student.  Niccoli-Messchaert had not assessed Student or met him prior to the virtual sessions, but she was familiar with his IEP goals.  Niccoli-Messchaert sent Parent a list of activity suggestions prior to the first session.  During the initial session, Parent attempted to engage Student in the activity a couple of times, but Student screamed and ran away.  Parent unsuccessfully tried to redirect Student.  Parent explained that Student had started a new medication three days earlier and Student was having a challenging morning.  Niccoli-Messchaert observed Student drop to the floor and roll around and hide behind furniture.  Parent offered to send videos of Student engaging in skills supporting his gross motor goal such as trying to ride his tricycle. Niccoli-Messchaert provided Parent examples of activities to work on with Student.

The second session also was largely unsuccessful.  Parent shared she tried to make a tunnel out of sheets, an activity suggested by Niccoli-Messchaert, but Student became upset and destroyed it.  Parent attempted to place the phone on the mantel, but Student ran away.  Niccoli-Messchaert suggested they conduct the next session outdoors since playing outdoors was a preferred activity for Student.  Niccoli-

Messchaert sent a follow-up letter to Parent and provided more examples of activities to try with Student that would help him make progress towards his IEP goals.  Parent cancelled the final two sessions because she did not believe the prior sessions were beneficial.

Parent generally testified the virtual physical therapy sessions were not effective for Student.  Student offered no expert testimony that the virtual coaching model was inappropriate, or established Student could not have made progress had he participated in the sessions.  Student failed to show by a preponderance of the evidence that Tulare City denied him a FAPE by failing to provide physical therapy services during the extended school year.

Denise Cors was a licensed occupational therapist.  She was certified by the National Board of Occupational Therapy in the area of pediatrics and school-based practices.  She held a bachelor's degree and a master's degree in occupational therapy.  She worked as an occupational therapist since 2000 and was employed by Tulare City since 2008.  She attended five of Student's IEP team meetings in 2020.  She conducted one virtual occupational therapy session with Student on June 26, 2020.  The remaining three sessions were cancelled by Parent, and Parent did not respond to Cors' telephone and email messages to reschedule the therapy sessions.  Cors made diligent efforts to reschedule sessions with Parent and offered to work around Parent's schedule, but Parent was non-responsive.

Cors provided careful and credible testimony during the hearing.  She had a detailed recollection of the one virtual occupational therapy session she had with Student.  Her substantial experience in occupational therapy, her detailed recollection of her virtual session with Student and her candid demeanor rendered her testimony persuasive.

Cors worked with Student on a cutting activity using self-opening scissors.  Cors instructed Parent how to direct Student to hold the paper, use a forearm rotation to apply the glue to paper and a pincer grasp to break off small pieces of dough and roll them in his hands.  Student used a plastic knife to cut the dough in half, and Cors instructed Student and Parent how to hold the knife.  Student was able to attend to the task for five to eight minutes with minimal prompting.  He attempted to leave the activity occasionally, but usually when he felt he was done with the activity.  Parent was able to easily redirect Student to the task.  Student failed to offer countervailing evidence during hearing.  Consequently, a preponderance of the evidence showed that Tulare City did not deny Student a FAPE by failing to provide appropriate occupational therapy during the 2020 extended school year.

Board-Certified Behavior Analyst Verduzco spoke with Parent on June 17, 2020, to review interventions for Student to make progress towards his IEP goals in attending to task, escape and avoidance and social skills.  Verduzco scheduled a consultation with Parent on June 26, 2020.  Parent did not attend the June 26, 2020 consultation, nor did she contact Verduzco to reschedule the session.

Each of the service providers opined that they made progress instructing Student using a distance learning model, or with time could make progress using a distance model.  Student offered no professional opinion that Student could not benefit from virtual instruction.  While many of the witnesses, including Student's expert witness Amy Balmanno, a school psychologist, agreed in-person instruction is the preferred method of teaching all students, no expert opined Student could not retain or recoup skills using a distance learning model.  Balmanno opined a virtual learning platform would not provide Student the opportunity to learn the social skills necessary for Student to make progress towards his social goals.  However, she was not familiar with

37

how any of the service providers conducted virtual sessions during the extended school year, or with the virtual program established by Tulare City for the 2020-2021 school year.  As a result, her opinion was not persuasive.  Board-Certified Behavior Analyst Delgado was reluctant to offer an opinion, and did not offer an opinion, that learning through a virtual platform, would not be effective for Student.  She explained she would need to gather data prior to coming to such a conclusion.

While the weight of the evidence proved in-person instruction is preferable for all students, typically developing or disabled, the educators who worked with Student during extended school year, including Lyons, Cors and Niccoli-Messchaert, credibly explained based upon their virtual sessions with Student and their prior experience providing virtual instruction that distance learning was an appropriate alternative method of delivery for Student.  Therefore, Student failed to meet his burden of proving that Tulare City's extended school year program was inappropriate.

## ISSUES 1(A) AND 2(C): FAILING TO MAKE A CLEAR OFFER OF FAPE FOR THE 2019-2020 SCHOOL YEAR AND EXTENDED SCHOOL YEAR AND 2020-2021 SCHOOL YEAR IN THE APRIL 29, 2020 IEP

Student contends Tulare City denied Student a FAPE by failing to make a clear offer of FAPE during the 2019-2020 school year and extended school year, and the 2020-2021 school year thereby denying him a FAPE.  More specifically, Student contends the April 29, 2020 IEP was unclear about the length of Student's instructional minutes during the school day, failed to include a coherent plan for Student's transition between two general education classrooms, and did not specify with clarity the amount of one-to-one aide support Student would receive.  Student also contends Tulare City predetermined Student's distance learning plan, discussed below.

38

Tulare City asserts that it made a clear offer of FAPE in the April 29, 2020 IEP and the offer was understood by Parent.  Tulare City argues Parent meaningfully participated in the development of Student's IEP over multiple meetings lasting approximately ten to twelve hours.

The IDEA requires a school district to make a clear written FAPE offer.  (*Union v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1526, cert. denied (1994) 513 U.S. 965 (*Union*).)  The school district must offer a single, specific program, in the form of a clear, coherent offer which parents can reasonably evaluate and decide whether to accept or reject. (*Glendale Unified Sch. Dist. v. Almasi* (C.D. Cal. 2000) 122 F.Supp.2d 1093, 1107-1108.) This requirement "should be enforced rigorously" as it creates a clear record to help eliminate factual disputes.  (*Union, supra*, 15 F.3d at p. 1526.)  It also assists the parents in presenting complaints with respect to any matter relating to the educational placement of the child.  (*Ibid*.; *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.* (9th Cir. 2010) 626 F.3d 431, 459-460.)  The IEP is to be read as a whole.  There is no requirement that necessary information be included in a particular section of the IEP if that information is contained elsewhere.  (20 U.S.C. § 1414(d)(1)(A)(ii); 34 C.F.R. § 300.320(d)(2); Ed. Code, § 56345, subd. (h).)

The IEP must comprehensively describe the child's educational needs and the corresponding special education and related services that meet those needs.  (*School Comm. of Burlington v. Department of Educ.* (1985) 471 U.S. 359, 368 [105 S.Ct. 1996] (*Burlington*).)  The IEP must identify the special education and related services and supplementary aids and services, including program modification or supports.  (*Id.*, 471 U.S. at 368; 20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.324(a)(2)(iv); Ed. Code, § 56345, subd. (a)(4).)  The frequency, location and duration of a related service is an IEP team decision that must be included in the school district's written offer of FAPE.  The IEP

39

must provide a statement of a preschool child's present levels of academic achievement and functional performance including, as appropriate, how the disability affects the child's participation in appropriate activities, measurable annual goals, and evaluation criteria.  (20 U.S.C. § 1414(d)(1)(A)(VII); 34 C.F.R. § 300.320(a (2006); Ed. Code, § 56345, subd. (a).)  The IEP must contain an explanation of the extent to which the student will not participate with nondisabled children in the regular class and during the provision of related services.  (20 U.S.C. § 1414(d)(1)(A)(i)(V); 34 C.F.R. § 300.320(a)(5); Ed. Code, § 56345, subd. (a)(5).)  The IEP, however, does not need to "maximize the potential of each [disabled] child commensurate with the opportunity provided non[disabled] children."  (*Rowley, supra*, 458 U.S. at p. 200.)

The IDEA requires prior written notice to parents when a school district proposes or refuses to initially or change the educational placement of a child with a disability or the provision of a FAPE.  (*Id.* at p. 1526; 20 U.S.C. § 1415(b)(3).)  The formal IEP offer may be clarified by a prior written notice.  (See 20 U.S.C. § 1415(b)(1)(C); 34 C.F.R. § 300.503; *Union, supra,* 15 F.3d at p. 1526.)

A due process decision must be based on substantive grounds when determining whether a child has received a FAPE.  A school district's failure to make a sufficiently specific offer of placement and services is a procedural violation of the IDEA.  (*Union, supra*, 15 F.3d at p. 1527; 20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R. § 300.320(a); Ed. Code, § 56505, subd. (j).)  A procedural violation results in a denial of FAPE if it impedes the child's right to a FAPE, significantly impedes the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the child or causes a deprivation of educational benefits.  (20 U.S.C. § 1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (j); *Rowley , supra*, 458 U.S. 176, 206-207; *W.G., et al. v. Board of Trustees of Target Range School Dist., etc.* (9th Cir. 1992) 960 F.2d 1470, 1484.) (*Target Range*), superseded

by statute on other grounds, as stated in *R.B. v. Napa Valley Unified School Dist.* (9th Cir. 2007) 496 F.3d 932, 939.)

Overall, the IEP must provide the child with a disability a "meaningful" educational benefit. (*J.L. v. Mercer Island Sch. Dist.* (9th Cir. 2010) 592 F.3d 938. 951, n. 10.) An IEP is evaluated in light of information available to the IEP team at the time it was developed; it is not judged in hindsight. (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149.) "An IEP is a snapshot, not a retrospective." (*Id.* at p, 1149, citing *Furhmann v. East Hanover Bd. of Education* (3rd Cir. 1993) 993 F.2d 1031, 1041.) It must be evaluated in terms of what was objectively reasonable when the IEP was developed. (*Ibid.*)

## STUDENT'S APRIL 29, 2020 IEP

Student's April 29, 2020 IEP was developed over six meetings held on April 29, May 5, May 13, May 21, May 26, and June 9, 2020. The IEP team included Parent, Director Zavaleta, Director Marroquin, general education preschool teacher Diana Romero, Speech Therapist Lyons, Special Education Resource Teacher Costa, School Psychologist Melissa Roam, Central Valley Regional Representative Barbara Newman, Tulare County Office of Education representative Rachel Weaver, Occupational Therapist Denise Cors, Board-Certified Behavior Analyst Verduzco, and Physical Therapist Diane Dowling. Student's private Board-Certified Behavior Analyst Delgado and Student's private speech therapists Amy Prince and Melissa Ream participated in one or more of the meetings. Tulare City and Student's attorneys attended the June 9 meeting.

The April 29, 2020 IEP contained a detailed description of Student's present levels of performance, including his difficulties in expressive and receptive language, functional communication, escape and avoidance behaviors, and gross and fine motor

deficits.  The IEP included preacademic annual goals in the areas of peer engagement, escape avoidance behaviors, attention to task, articulation, receptive language, responding to yes or no questions, functional communication, gross motor, mobility, and fine motor/prewriting and cutting.

The IEP included a behavior intervention plan designed to address Student's escape and avoidance behaviors when he was presented with a non-preferred task.  The behavior intervention plan included a variety of research-based applied behavior analysis methods, such as intermittently offering the preferred item with adult prompting.  Preference assessments would be conducted regularly to identify preferred stimuli to reinforce positive behaviors.  Data would be collected for the current target behaviors and replacement behaviors at least once per week by staff members responsible for implementing the behavior intervention plan.

To meet Student's goals, the IEP offered a variety of accommodations and supports.  Accommodations included starting Student on preferred tasks at group activity time and gradually increasing time on less preferred tasks.  Parent requested, and the IEP team agreed, to consultations between Tulare City's Board-Certified Behavior Analyst and the IEP service providers and team meetings between Parent and the service providers to monitor Student's progress every six to eight weeks for one and one-half hours.  The physical therapist and speech and language pathologist would each hold two, 15-minute consultations monthly with Student's teacher.  The Board-Certified Behavior Analyst would meet once monthly for fifteen minutes with Student's teacher and aides.  The Board-Certified Behavior Analyst would conduct one annual two-hour training for staff on Student's supports and services; one 30-minute monthly consultation with the speech and language pathologist; one 30-minute consultation monthly with Student's aide, and one 45-minute monthly consultation with Parent.  Staff

would receive one annual two-hour training on Student's alternative augmentative communication device.

The April 29, 2020 IEP document offered Student specific related services to address each area of identified deficit.  Services included 120 minutes, or eight 15-minute sessions, per month of individual and group speech therapy to support his language and communication goals.  The IEP provided Student 40 minutes, or two 20-minute sessions, monthly physical therapy and 120 minutes monthly occupational therapy.  Behavior services included a one-to-one aide ninety-minutes, four times per week.  The IEP document expressly indicated the behavior intervention minutes would be adjusted based upon Student's actual program of enrollment.

The IEP included extended school year services that were easy to understand. The services included including 30-minutes weekly physical therapy, 30-minutes weekly occupational therapy, and 30-minutes weekly speech and language therapy for four weeks.  It offered Parent one 45-minutes consultation between Tulare City's Board-Certified Behavior Analyst and Parent.

PLACEMENT IN A COMBINATION SMALLER INTERVENTION CLASS AND GENERAL EDUCATION CLASS

A school district is required to ensure the placement decision for a preschool aged child with a disability is made by a group of people, including the parents and other people knowledgeable about the student's evaluation data and is in the least restrictive environment.  (34 C.F.R. § 300,114 through 34 C.F.R. § 300.118.)  The group of people making the placement decision must consider whether supplementary aids and services could be provided that would enable the education of a preschool child with a

disability in the regular educational setting to be achieved satisfactorily.  (34 C.F.R.
§ 300.114(a)(2); *Dear Colleague Letter*, OSERS (January 9, 2017) 69 IDELR 106.)

The Education Code describes the settings for the delivery of early education
services to preschool children.  These include a regular public or private nonsectarian
preschool program, a child development center, a child's home, a special site where
preschool programs for both children with disabilities and children who are not disabled
are located close to each other and share resources and programming, and a special
education preschool program with children who are not disabled attending and
participating in all or part of the program.  (Ed. Code, § 56441.4.)

A school district does not per se violate the IDEA by not specifying the school
where special education services will be delivered.  (*Rachel H. v. Department of Hawaii*
(9th Cir. 2017) 868 F.3d 1085, 1090.)  The term "location" under the IDEA means the
"appropriate education environment for the delivery of specific special education
service." (*Id.* at p. 1090.)  However, in some instances, a particular school or classroom
may be relevant for parents to participate meaningfully in the IEP process.  (*Id.* at
pp. 1092-1093, citing *A.K. ex rel. J.K. v. Alexandria City School Bd.* (4th Cir. 2007) 484 F.3d
672, 681; *Union*, *supra*, 15 F.3d at p. 1525.)  For example, the failure to identify a school
can result in a denial of FAPE when a child's disability demands delivery of special
education services at a particular location.  *(Rachel H.*, *supra*, 858 F.3d at p. 1093.).*  A
school district cannot offer a wide variety of placement options, each of which includes
distinct programs, and request a parent to choose.  (*Glendale Unified Sch. Dist., supra,*
122 F.Supp.2d at pp. 1107-1108 [district had responsibility to use its expertise to decide
which program was best suited for [student's] unique needs].)

The April 29, 2020 IEP offered Student placement verbatim as follows, "a
combined program of placement in the smaller intervention group and larger classroom

was discussed to assist with the transition back into school.  It is recommended that [Student] attend the smaller intervention group for at least 2 weeks at the start of the school year, prior to transitioning to the larger general education classroom."  The specific general education classroom would be determined after school resumed at the start of the 2020-2021 school year and Parent observed the classrooms.

At hearing, Director Marroquin testified about the preschool programs available at Tulare City for the 2020-2021 school year.  Tulare City offered two general education preschool classes for four-year old children.  One class met five days per week, three hours per day and had morning and afternoon sessions.  It had a larger class size of 20-24 students and three teachers or staff.  The other class met twice weekly for two hours each session and had approximately 20 students and two teachers or staff.  These programs were located at various locations within the school district, and Parent had the option of selecting the location, subject to availability.

Here, the offer of placement was ambiguous because the IEP document contained no description of the "smaller intervention group" or the "larger general education classroom", which made the offer of placement unclear and incapable of enforcement.  The April 29, 2020 IEP's failure to describe the settings for the "small intervention" class or "larger general education" in a coherent manner constituted a procedural error.  This error made the offer unclear because the extent to which Student would participate with nondisabled children in the regular class and during the provision of related services was not specified.  (20 U.S.C. § 1414(d)(1)(A)(i)(V); 34 C.F.R. § 300.320(a)(5); Ed. Code, § 56345, subd. (a)(5).)

At hearing, Parent vaguely explained she did not understand the differences between the small intervention class and larger general education class.  The weight of the evidence proved, however, that Parent understood the two classes.  Student

attended the Intervention Class for the 2019-2020 school year and therefore Parent was familiar with the classroom structure and schedule.  Parent relayed to the IEP team on multiple occasions that she preferred for Student to participate in the larger general education class so Student would have more opportunities to model his typically developing peers.  Parent toured four school locations with Director Marroquin in early August 2020 and therefore had the opportunity to observe the classes.

Director Marroquin believed Parent understood the offer of placement.  Parent confirmed the locations of the school sites and the hours of the larger general education class with the IEP team.  Parent expressed on multiple occasions she wanted Student to participate in the larger general education class.  The weight of the evidence established Parent had a solid understanding of the two classes.  Therefore, Student did not prove the lack of description about the two classes denied Parent meaningful participation in the IEP process.  (20 U.S.C. § 1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (f)(2); *J.L.. supra,* 592 F.3d at  946-947; *E.B. v. Baldwin Park Unified School District* (C.D. Cal., Aug. 10, 2020) 2020 WL 5875149, *13.)

Student also did not prove that this procedural error impeded Student's right to a FAPE or caused a deprivation of educational benefit.  Director Zavaleta and Director Marroquin explained that neurotypical children attended both the smaller intervention classroom and the larger general education classroom.  Student would participate with his typically developing peers in either classroom.  (Ed. Code, § 56441.4.)  The April 29, 2020 IEP stated Student's related services would be provided in the regular classroom. Therefore, Student would spend the entirety of the school day with his typically developing peers.  Student presented no evidence establishing Student's right to a FAPE was impeded or that he was deprived of educational benefit.  Therefore, Student was not denied a FAPE.

PLAN TO TRANSITION BETWEEN SMALLER INTERVENTION CLASS TO LARGER GENERAL EDUCATION CLASSROOM

Student further challenges the clarity of the offer of FAPE because the IEP team determined Student should start in the smaller intervention classroom for two weeks and then transition to the larger general education classroom.  Student argues there was no specific "plan" written into the IEP, making the offer ambiguous and denying Student a FAPE.

The evidence proved Parent participated in the discussion about starting Student in the intervention class and then moving him to the larger general education classroom.  The IEP team agreed it was important to evaluate how Student progressed in the classroom setting because Student had been out of school for many months in light of the school closure.  Parent proposed at the May 26, 2020 IEP team meeting that Student begin the school year in the smaller intervention group, and then transfer two weeks later to the general education classroom.  The specific general education classroom would be determined after school resumed and Parent toured several preschools with Director Marroquin.  A plan would be developed after Parent selected the preschool location and school resumed.

The IEP's failure to contain a specific plan about how Student would transition between the two classrooms did not constitute a procedural denial of FAPE.  The IEP team could create a more detailed plan without violating the requirement of a formal written offer.  (*B.M. ex rel. R.M. v. Encinitas Union School Dist.* (S.D. Cal. February 14, 2013, 08cv412-L(JMA)) 2013 WL 593417, **11-12 [failure of IEP to include transition plan from a largely in-home program to a public-school special education classroom did not result in denial of FAPE].)  At the time the April 29, 2020 IEP was developed, Parent had not toured the preschools or communicated her desired location.  Therefore, it was

premature for the IEP team to create a detailed transition plan, and this could have been developed at a later date.  Student failed to prove that the April 29, 2020 offer of FAPE was unclear based on how Student would transition between the smaller intervention class and the larger general education class.

OFFER OF ONE-ON-ONE AIDE SUPPORT

The April 29, 2020 IEP provided Student with ninety-minutes, four time per week of a one-to-one aide trained in applied behavior analysis.  The IEP further provided the total minutes would be based on Student's "program of enrollment".  The aide would work with Student one-to-one when he was "not in a one-to-one supervision situation." The offer of FAPE was explicit the actual minutes of Student's aide support would be based on his program of enrollment.

All of the witnesses who testified understood Student's aide services would be calculated based on which preschool program he attended.  Director of Special Education Zavaleta explained Student would be supported by a one-to-one aide when he was not working with other adults, such as his related service providers.  Parent's testimony was consistent with Zavaleta.  Parent understood Student would have a one-to-one aide when he was not working with his service providers.  Therefore, Student did not meet his burden of proving the offer of FAPE was unclear for failure to make a clear offer of aide support.

A preponderance of the evidence proved the April 29, 2020 IEP made a clear offer of FAPE.  The April 29, 2020 IEP contained a solid educational plan in light of Student's circumstances and provided a written offer that was understood by Parent so she could provide informed consent or reject the offer.  The IEP detailed Student's strengths, present information regarding his preacademic skills, communication, gross motor skills,

48

fine motor skills, and behaviors.  Based upon Student's present levels of performance and unique needs, the IEP document included eleven annual goals for Student.  Each goal contained baselines, short-term objectives and designated school staff responsible for Student's progress towards the goal.  The eleven goals covered Student's identified areas of deficit.  To meet the goals, the IEP offered program accommodations including starting with preferred tasks and spending shorter time on non-preferred tasks and conducting preference assessments.  Student would be supported by a one-to-one aide trained in applied behavior analysis.  Consultations between Student's service providers and Student's teacher and Parent and staff training on Student's supports and services were designed to ensure consistent and frequent communication between the teachers, service providers and Parent about Student's needs.

 Parent actively participated in developing all aspects of Student's program, including contributing information about Student's present levels of performance and development of IEP goals and actively discussed Student's related services, supports and accommodations.  Tulare City was receptive to Parent's input and incorporated many of Parent's recommendations.  For example, Parent suggested specific interventions be listed within each behavioral goal and requested the IEP clarify which staff member would measure Student's progress.  She suggested the need to include preference assessments with Student's behavior goals.

At hearing it was evident from Parent's testimony that she understood the IEP offer but desired a private school placement for Student.  Moreover, Parent and her attorney attended the June 9, 2020 IEP team meeting and August 12, 2020 IEP amendment team meeting and did not request information or clarification about the offer.

Therefore, Student failed to meet his burden of proving that Tulare City denied him a FAPE during the 2019-2020 school year and extended school year and 2020-2021 school year by not making a clear offer of FAPE.  Tulare City prevailed on Issues 1(a) and 2(c).

## ISSUE 2(A): DENIAL OF FAPE DURING THE 2020-2021 SCHOOL YEAR THROUGH MAY 7, 2021 BY FAILING TO IMPLEMENT STUDENT'S IEP

Student contends Tulare City failed to implement Student's IEP during the 2020-2021 school year.  The April 29, 2020 IEP was the operative IEP for the 2020-2021 school year.

Tulare City contends it remained willing and able to implement Student's IEP at all times during the 2020-2021 school year, but Parent placed Student at Fairmont, a private preschool located in Fresno, California.  Tulare City further contends it offered Student in-person related services and a blended program of in-person and virtual learning, but Parent declined the offer of related services or to enroll in Tulare City's blended program.

A parentally placed private school child with a disability does not have an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school.  (20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.137(a).)  Parent may obtain reimbursement from a school district after placing the child in a private school in some circumstances, including where the school district did not provide the child with a FAPE.  (*Burlington*, *supra*, 471 U.S. at p. 369.)

Tulare City began the 2020-2021 school year using a distance learning model. Tulare City's decision was based on the July 17, 2020 COVID-19 and Reopening In-Person Learning Framework for K-12 Schools by the State Public Health Officer and

California Department of Public Health.  (State of California – Health and Human Services Agency, California Department of Public Health, *COVID-19 Public Health Guidance for K-12 Schools in California, 2020-2021 School Year* (July 17, 2020).)  The Framework prohibited in-person instruction at schools operating within a county in Tier 1 due to high-rates of COVID-19 and provided a mechanism for elementary schools in those counties to request a waiver to permit reopening for in-person instruction.  Tulare County remained on the State of California's COVID-19 monitoring list and could not open for in-person instruction.

Upon approval by the state of California, Tulare City planned to transition to a blended learning program.  The program was five days per-week for three hours each day.  Students would participate in one and one-half hours synchronous learning and one and one-half hours asynchronous learning.  Students would meet in person with their assigned cohorts of no more than ten students two days a week, and every other Wednesday.  Students would participate in distance learning activities on the days they were not at the school site.  A virtual aide was available for Student's synchronous sessions.  Parent consultations and training would be available for Student's asynchronous time.

Parent consented to the April 29, 2020 IEP on June 16, 2020.  Parent, through her attorney, notified Tulare City by letter dated July 29, 2020 of Parent's intention to unilaterally place Student in an appropriate education setting on the basis Tulare City failed to provide Student a FAPE.  Student began attending Fairmont on August 17, 2020.

Tulare City notified Parent by letter on August 20, 2020, of its willingness to provide Student's special education and related services through distance learning.  Parent notified Tulare City by letter dated August 21, 2020 that she had placed Student

at Fairmont.  No evidence was offered that Parent responded to Tulare City's offer to provide related services to Student virtually.  Student's IEP team met on September 24, 2020 to review independent educational evaluations and to discuss Tulare City's offer to provide in-person related services.  Parent declined the offer of in-person related services.

Tulare City provided Parent a proposed schedule of special education related services on October 2, 2020 and October 13, 2020.  At hearing, Parent was evasive and failed to answer whether she received the offer of services.  Lyons' testimony that she provided the schedule of services to Parent was corroborated by Lyons' entries in Student's case log maintained by Tulare City.

Tulare City notified Parent by letter dated January 15, 2021, Tulare City was implementing the blended preschool program with a combination of distance learning and in-person instruction through small cohorts as described in its Preschool Reopening Plan.  Parent did not respond.  Student attended 78 days of school at Fairmont during the 2020-2021 school year through April 2021.

The evidence proved at all times during the 2020-2021 school year Tulare City made Student's placement and services available to Student.  Student failed to attend school, and therefore Tulare City was unable to implement Student's program and services.  Student's Issue 2(a) fails as a matter of law because Tulare City cannot implement its public-school program for Student who was privately placed.  Therefore, Student did not meet his burden of proving Tulare City failed to implement the April 29, 2020 IEP for the 2020-2021 school year through May 7, 2021.

## ISSUES 1(F) AND 2(E): DISTANCE LEARNING PLAN AND SUPPORTS

Student contends Tulare City denied Student a FAPE by not providing Student a clear distance learning plan for the 2019-2020 and 2020-2021 school years.  Student further contends Tulare City failed to provide accommodations to support Student's distance learning.

Tulare City contends it complied with state and federal mandates and provided Student special education and related services using a distance learning model.  It argues its provision of Parent consultations and coaching and a virtual behavior aide were appropriate delivery models due to its inability to provide services in-person.

## DISTANCE LEARNING PLAN FOR EMERGENCY CONDITIONS

The IDEA does not explicitly require an IEP to include a plan for how special education and related services will be delivered if a school closure requires distance learning.  In its March 12, 2020 guidance, the Department of Education advised that while IEP teams are not required to include distance learning plans in a child's IEP, they may choose to do.  "Creating a contingency plan before a COVID-19 outbreak occurs gives the child's service providers and the child's parents an opportunity to reach agreement as to what circumstances could trigger the use of the child's distance learning plan and the services that would be provided during the dismissal."  (OSERS, *Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak* (March 12, 2020), (OSERS Q & A).)

On June 29, 2020, Governor Newsom signed the 2020 Budget Act and accompanying budget implementing legislation, including Senate Bill (SB) 98 (Chapter  24, Statutes of 2020).  SB 98 included important changes related to special education and distance learning.  SB 98 amended Education Code section 56345 to

require IEP teams to make an individualized determination about how an IEP will be provided under emergency conditions, in which instruction or services, or both, cannot be provided to the student either at the school or in person for more than ten school days.  (Ed. Code, § 56345(a)(9)(A).)  This description must be included in the development of each initial IEP or addressed during the regularly scheduled revision of an IEP and must take public health orders into account.  (Ed. Code, § 56345(a)(9)(B).)

## THE 2019-2020 SCHOOL YEAR

Student's April 29, 2020 IEP was signed on June 16, 2020.  Student's IEP team was not required at the time to include a description of the how Student's instruction and services would be provided under emergency conditions because at that time section 56345(a)(9)(B) was not in effect.  (Ed. Code, § 56345(a)(9)(B); *E.M.C.*, *supra*, WL 7094071 at p. 7 [no individualized determination about in-person services required during emergency conditions where IEP signed prior to effective date of new statute].)  Based upon the express terms of this statute, the IEP team was not required to include a distance learning plan with Student's IEP until Student's next regularly scheduled IEP.  Accordingly, Student did not meet his burden of proving Tulare City denied Student a FAPE by failing to offer a distance learning plan during the 2019-2020 school year or extended school year.

## THE 2020-2021 SCHOOL YEAR

Student contends Tulare City denied Student a FAPE by failing to provide adequate distance learning supports, including in-person aide support, during distance learning.  This issue of whether Tulare City was required to provide in-person aide support is addressed in Issues 1(c) and 2(c).

Tulare City contends it implemented a distance learning model at the start of the 2020-2021 school year in accordance with newly enacted Education Code section 43503. (Ed. Code, § 43503(b)(4).)  It contends had Student chosen to attend school at Tulare City, it would have implemented Student's IEP through a distance learning model, which included virtual aide support and Parent consultations and coaching.

Education Code section 43503 was enacted for the 2020-2021 school year.  (Ed. Code, § 43503(b)(4).)  Section 43503 confirmed delivery of special education and related services in a student's IEP could be executed in a distance learning environment with accommodations necessary to ensure that a student's IEP could be executed in that environment..  (Ed. Code, § 43503(b)(4).)  "Distance learning" was described as instruction in which the student and instructor are in different locations, including by computer, video, audio and written instruction.  Under section 43503, distance learning should include computer access, grade-level content and academic supports, as well as daily live interaction with certified employees and peers for instructional purposes through the internet or telephonic communication.  (Ed. Code, § 43503(a)(1)-(3).)

Tulare City made substantial changes to its distance learning program for the 2020-2021 school year.  This included creation of a virtual classroom, coaching and support for parents, visual schedules, and virtual social interactions between students in the cohorts.  Tulare City's Board-Certified Behavior Analyst for the 2020-2021 school year was Kathryn Lee-Carothers.  Lee-Carothers testified at hearing.  Lee-Carothers was a Board-Certified Behavior Analyst since 2013.  She held a bachelor's degree in psychology and a master's degree in applied behavior analysis.  She had substantial experience working as a behavior consultant and supervisor in the clinical setting.  Lee-Carothers' experience and careful testimony rendered her opinions persuasive.

Lee-Carothers provided support to teachers, students and parents during the 2020-2021 school year during distance learning.  She supervised aides providing support to students during virtual learning.  At hearing, Lee-Carothers explained how virtual aides supported parents during virtual learning.  Student aides discussed with parents how to set-up the home environment to remove distractions.  They developed positive reinforcements and visual schedules and created virtual breakout rooms to work with students and their parents.  The aides prepared checklists and flowcharts for the parents.  For asynchronous instruction, the aides conducted parent training and coaching.  When parents had difficulties with instructional control over their children, the aides created visual schedules, sent out instructions to the parents and encouraged the parents to pair a behavior with a reward.  They also created separate virtual breakout rooms where they would speak privately with the parents about strategies to work towards a goal and provide the student a reward for positive behavior.

Lee-Carothers was a credible and experienced witness.  Her testimony persuasively showed that Tulare City appropriately considered and met Student's behavior needs.  Lee-Carothers opined that parent training and coaching has been used for more than fifty years and was developed using evidence-based research.  She explained parent training and coaching is an effective method of delivering virtual behavior support and is often used in rural areas where families lack Internet access.  Lee-Carothers' testimony regarding the effectiveness of parent coaching and consultations to teach behavioral skills was consistent with Verduzco's testimony.  Both witnesses persuasively opined that parent coaching was an appropriate method to deliver Student's behavioral supports.  Student failed to present evidence that impugned Lee-Carothers' and Verduzco's testimony.

Director Marroquin persuasively testified at hearing about Tulare City's virtual distance learning program for the 2020-2021 school year.  The virtual classrooms had visual schedules and props.  The daily schedule closely approximated a typical school day, and included circle time, music and movement, structured activities, socialization between students, snack and free play.  Students engaged in social interactions and activities with their peers.

Student offered no expert opinion evidence contradicting the opinions of Lee-Carothers, Verduzco and Marroquin.  Student's expert witness Balmanno generally opined that virtual learning would not be beneficial for Student because it would not provide Student an opportunity to work on his social and communication skills with peers.  Balmanno's opinion was based largely on observations of her own children's experiences with distance learning.  Balmanno was not familiar with Tulare City's distance learning program for the 2020-2021 school year.  Balmanno did not speak with any of Tulare City's teachers or staff concerning the program.  Balmanno did not observe Tulare City's distance learning program during the 2020-2021 school year. These omissions rendered Balmanno's testimony largely unpersuasive.  Fairmont's Director Kathy Towle believed Student required the support of an aide to participate in distance learning, but she was not familiar with Tulare City's distance learning program. Although all the witnesses who testified on the subject agreed in-person instruction is preferable Tulare City proved the distance learning model, with virtual aide support and coaching, was a close approximation to Student's IEP.

Parent testified that she lacked instructional control over Student, even though she had engaged in many private applied behavioral analysis trainings.  Parent did not participate in the coaching and consultation sessions with Tulare City's Board-Certified Behavior Analysts and behavior aides, and Student did not participate in distance

learning during the 2020-2021 school year.  Therefore, it is speculative to conclude
Student could not make meaningful progress towards his IEP goals in a distance
learning model.  Student failed to prove by the preponderance of the evidence that
Tulare City's distance learning program was inadequate.

## ISSUES 2(B): DENIAL OF FAPE DURING THE 2020-2021 SCHOOL YEAR, THROUGH MAY 7, 2021, BY FAILING TO OFFER ADEQUATE BEHAVIOR SUPPORT

Student contends Tulare City denied Student a FAPE by failing to offer
appropriate behavioral support to address Student's known maladaptive behaviors.
More specifically, Student contends Tulare City's offer of virtual aide support during
synchronous learning only denied him a FAPE.

Tulare City argues it complied with state and federal mandates and offered
Student virtual aide support during the synchronous learning times given the school
closure and inability to deliver those services in person and provided Parent coaching
and consultations.

As discussed in Issues 1(b), 1(f) and 2(e), Tulare City proved through expert
testimony that its offer of behavioral supports, distance learning program and
accommodations for the 2019-2020 school year and extended school year and 2020-
2021 school year closely replicated Student's IEP placement and services.  Tulare City
was required during the school closure to deliver Student's educational program to the
extent feasible through options such as distance learning.  (*R.F. Frankel, supra,* 224
F.Supp. 3d. 979; *Vashon Island School, supra,* 337 F.3d at 1131.)  Tulare City further
proved the distance learning program, if implemented, would have allowed Student to
make meaningful progress towards his goals.

The IEP team met on August 12, 2020.  The primary purpose of the meeting was to discuss Parent's July 29, 2020 unilateral notice of her intent to enroll Student in a private school and seek reimbursement from Tulare City.  The IEP team also discussed Student's distance learning program and Student's aide support for the 2020-2021 school year.

The IEP team discussed Tulare City's plans for starting the 2020-2021 school year in distance learning.  Student's program would be delivered in the distance learning model.  Student would receive one and one-half hours of synchronous virtual instruction and one and one-half hours of asynchronous at-home learning.  Virtual aide support would be provided during synchronous learning, and Parent coaching and consultation would be available to Parent during asynchronous learning.  Parent objected to distance learning and requested in-person aide support and services.  Parent believed that virtual learning was not effective for Student, and he engaged in self-injurious and aggressive behaviors after the virtual sessions ended.  Parent requested Tulare City provide in-person instruction and services in the home, at a school site, or with a private provider. Tulare City properly declined Parent's request based upon COVID-19 health and safety concerns.

The IEP team discussed strategies and supports to support Student in accessing the distance learning model, including using visual schedules and providing the lesson plans to Parent before the next class.  Lee-Carothers explained a behavior aide would support Student during synchronous learning time.  Lee-Carothers or aides would be available to support Parent and Student during asynchronous learning.  Student failed to present persuasive evidence that contradicted Lee-Carothers' testimony.

The August 12, 2020 IEP team also discussed Student's progress.  Parent described the tremendous improvements Student had made over the summer,

academically and behaviorally.  Parent explained Student made academic progress over the summer months since working with Parent and Student's private service providers. He used five to seven-word sentences, could count to 30, recognized all letters of the alphabet, numbers and colors, and followed two to four step directions.  Parent told the IEP team Student had "recouped" all his skills.

With respect to Student's behaviors, Parent explained Student transitioned from preferred to non-preferred tasks without throwing tantrums and his self-injurious and aggressive behaviors were "not there anymore" and "we're in a different place."  She attributed Student's success to her at-home instruction, as well as extensive private applied behavior analysis services paid by Parent's medical insurance.  Based upon the information shared by Parent, the August 12, 2020 IEP team reasonably believed Student could make progress in a distance learning format with accommodations.

Parent offered contradictory and sometimes confusing testimony at hearing.  She testified Student engaged in self-injurious and aggressive behaviors after he participated in virtual sessions.  Presumably, Parent was referring to the extended school year virtual sessions with Tulare City's service providers.  Parent did not share this information with the August 12 2020 IEP team.  None of Tulare City's service providers observed Student commit self-injurious and aggressive behaviors during virtual learning or testified that Parent told them Student engaged in these behaviors after virtual sessions.  Parent also testified Student had successful virtual speech therapy services with his private speech therapist, but at hearing unpersuasively denied that these sessions were appropriate.

Board-Certified Behavior Analyst Delgado did not observe Student engage in any self-injurious or aggressive behaviors during at least one virtual applied behavior analysis session she had with Student.  She explained it took several prompts for

Student to greet Delgado, but she did not testify that Student engaged in any maladaptive behaviors.  Further, Delgado and Balmanno did not offer testimony that they were aware Student engaged in self-injurious or aggressive behaviors during or after virtual sessions.

Although Parent believed in-person services were preferable, the weight of the evidence proved Student could make progress in Tulare City's distance learning program with accommodations.  Further, Student failed to offer countervailing expert testimony or other evidence that parent coaching and consultations during asynchronous learning was not a close approximation to Student's IEP aide support.  Therefore, Student failed to meet his burden of proving Tulare City's offer of virtual aide support and parent coaching was not a close approximation to Student's aide services.  Student did not prevail on Issue 2(b).

## ISSUES 1(E) AND 2(D): PREDETERMINING STUDENT'S DISTANCE LEARNING PROGRAM

Student contends Tulare City predetermined Student's supports and services during the 2019-2020 regular school year and extended school year, and for the 2020-2021 school year.  Tulare City disputes it predetermined Student's supports and services.  Tulare City asserts Parent meaningfully participated in all IEP team meetings developing the April 29, 2020 IEP.

Parental participation is a cornerstone of the IEP process.  (20 U.S.C. § 1415(b)(2);34 C.F.R. § 300.501(b); Ed Code, § 56304, subd. (a).)  Predetermination of an IEP offer violates the right of parental participation.  Predetermination occurs when a district has decided on its offer prior to the IEP team meeting, including when it presents one placement option and is unwilling to consider other alternatives.  (*H.B. v. Las*

*Virgenes Unified School District* (9th Cir. 2007) 239 Fed. App. 342, 344-345 [nonpub. Opn.].)  School district staff must enter the IEP team meeting with an open mind and meaningfully consider the parents' input.  (*H.B., et al., supra*, at p. 344; *Vashon Island, supra*, 337 F.3d at p. 1131.)

## 2019-2020 SCHOOL YEAR AND EXTENDED SCHOOL YEAR

Student contends Tulare City predetermined Student's distance learning program.  Tulare City denies that it predetermined Student's distance learning program, and further that it was required to pivot to a distance learning model in light of the COVID-19 pandemic.

CDE's April 9, 2020 guidance advised school districts it was unnecessary for a school district to convene an IEP team meeting, or propose an IEP amendment without a team meeting, for the purpose of discussing the need to provided services away from school, nor was it not necessary for a school district to obtain the parent's written consent to provide previously agreed upon services away from school.  (*CDE Guidance*, April 9, 2020.)  The IEP that was in effect at the time of the school closure remained in effect for students, and districts were directed to continue to provide the services called for in the IEPs in alternative ways to the greatest extent possible.  (*Ibid.*)  CDE acknowledged there might be circumstances when amending an IEP to reflect the change to distance learning might be necessary and urged school districts to communicate and collaborate with parents to transition students to distance learning.

In his closing brief, Student appears to have abandoned his argument Tulare City predetermined Student's distance learning for the 2019-2020 regular school year and extended year.  Regardless, Student did not meet his burden of proof that Tulare City predetermined the distance learning plan for the 2019-2020 regular and extended

school year.  The IEP team discussed Parent's concerns about Student's challenges with distance learning in developing the April 29, 2020 IEP.  The IEP team developed strategies for supporting Parent, including consultations and coaching between Tulare City's Board-Certified Behavior Analyst and Parent.  The IEP team also agreed to increase the consultation hours between the Board-Certified Behavior Analyst and Student's one-to-one aide and the service providers.  The team discussed implementing a video/virtual real-time coaching model with Parent and Student's service providers during extended school year.  Parent requested, and the IEP team agreed, to provide additional At-Home Learning Packets for Student during the summer.  Student did not meet his burden of proving Tulare City predetermined Student's distance learning during the 2019-2020 regular and extended school year.

## 2020-2021 SCHOOL YEAR

Student's predetermination claim for the 2020-2021 school year is based largely on statements made by Tulare City's attorney at the August 12, 2020 IEP amendment team meeting that Tulare City would not provide in-person services until it was "safe" to do so.  At the time of the August 12, 202 IEP team meeting California's stay-at-home order was in effect in light of the COVID-19 pandemic.  Tulare City's compliance with the stay-at-home order should not be confused with predetermination.  At the time, Tulare City was bound by the stay-at-home order.  As discussed at Issue 1(c), CDE's April 9, 2020 guidance did not impose an obligation on Tulare City to provide services in-person absent an individualized IEP team determination such services were necessary to protect a student's health and safety.

Further, the IEP team actively and meaningfully discussed Parent's concerns about distance learning at the May 21, 2020 and June 9, 2020 IEP team meetings.  In

response to Parent's concerns, the IEP team offered Parent coaching by Tulare City's Board-Certified Behavior Analyst and consultations with Student's service providers.

The August 12, 2020 IEP team had a robust discussion about Parent's request for in-person services.  Parent was accompanied at this meeting by her special education attorney.  The IEP team again discussed ways to improve virtual learning sessions for Student, including creating a visual schedule, providing Student a virtual behavior aide, providing the lesson plan to Parent prior to the session, and providing Parent coaching on techniques and strategies to ensure Student was successful during distance learning.

The IEP team determined, based upon Parent's reports about Student's progress in academics, speech and behavior, and Occupational Therapist Cors and Speech Therapist Lyons' reports about Student's progress during extended school year that Student could receive a FAPE though Tulare City's distance learning program. Accordingly, Student failed to meet his burden of proof that Student's distance learning was predetermined in advance of any of the IEP team meetings.

## CONCLUSIONS AND PREVAILING PARTY

As required by California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided.

Issues 1 (a) and 2(c): Tulare City did not deny Student a FAPE during the 2019-2020 school year and extended school year and 2020-2021 school year by failing to make a clear offer of FAPE in the April 29, 2020 IEP.  Tulare City prevailed on Issue (1)(a).

Issue 1(b): Tulare City did not deny Student a FAPE during the 2019-2020 school year and extended school year by failing to offer adequate behavior supports in the April 29, 2020 IEP.  Tulare City prevailed on Issue 1(b).

Issue 1(c): Tulare City denied Student a FAPE during the 2019-2020 school year and extended school year by failing to implement Student's IEP, beginning March 13, 2020.  Student prevailed on Issue 1(c) with respect to the 2019-2020 regular school year.

Issue 1(d): Tulare City did not deny Student a FAPE during the 2019-2020 school year and extended school year by failing to offer extended school year services.  Tulare City prevailed on Issue 1(d).

Issues 1(e) and 2(d):  Tulare City did not deny Student a FAPE during the 2019-2020 school year and extended school year and 2020-2021 school year by predetermining Student's distance learning.  Tulare City prevailed on Issues 1(e) and 2(d).

Issues 1(f) and 2(e): Tulare City did not deny Student a FAPE during the 2019-2020 school year and extended school year and 2020-2021 school year by failing to offer adequate distance learning supports.  Tulare City prevailed on Issues 1(f) and 2(e).

Issue 2(a): Tulare City did not deny Student a FAPE during the 2020-2021 school year by failing to implement Student's IEP.  Tulare City prevailed on Issue (2)(a).

Issue 2(b): Tulare City did not deny Student a FAPE during the 2020-2021 school year by failing to offer adequate behavior supports.  Tulare City prevailed on Issue (2)(b).

REMEDIES

Student prevailed on Issue 1(c) for the period March 23, 2020 through June 6, 2020.  Student is entitled to remedies for this denial of FAPE.

Courts have broad equitable powers to remedy the failure of a school district to provide FAPE to a disabled child.  (20 U.S.C. § 1415(i)(1)(C)(iii); Ed. Code, § 56505, subd. (g).)  This broad equitable authority extends to an Administrative Law Judge who hears and decides a special education administrative due process complaint.  ALJs have broad latitude to fashion appropriate equitable remedies for the denial of a FAPE. (*Burlington, supra,* 471 U.S. at p. 370.)

School districts may be ordered to provide compensatory education or additional services to a student who has been denied a FAPE.  (*Student W. v. Puyallup School Dist.* (9th Cir. 1994) 31 F.3d 1489, 1496 *(Puyallup)*.)  An award of compensatory education need not provide a day-for-day compensation.  (*Id.* at pp. 1496-1497.)  Compensatory education is a prospective award of educational services designed to catch-up the student to where he should have been absent the denial of a FAPE.  (*Brennan v. Regional School Dist. No. 1* (D.Conn. 2008) 531 F.Supp.2d 245, 265; *Orange Unified School Dist. v. C.K.* (C.D.Cal. June 4, 2012, No. SACV 11-1253 JVS(MLGx)) 2012 WL 247839, *12.)  A student is entitled to relief that is "appropriate" in light of the purposes of the IDEA.  (20 U.S.C. § 1415(i)(2)(C)(iii); 34 C.F.R. § 300.516(c)(3).)  The conduct of both parties must be reviewed and considered to determine whether equitable relief is appropriate.  (*Puyallup, supra*, 31 F.3d at pp. 1496-1497.)

An award to compensate for past violations must rely on an individualized assessment, just as an IEP focuses on the individual student's needs.  (*Reid ex rel. Reid v. Dist. of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524 citing *Puyallup., supra*, 31 F.3d at

p. 1497.)  The award must be fact-specific and be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place".  (*Reid ex rel. Reid, supra*, 401 F.3d at p. 524.)

Student requests as a remedy that Tulare City reimburse Student for costs of tuition paid by Parent at Fairmont for the 2020-2021 school year.  A school district is not required to pay for a preschooler's private program if the district made a FAPE available to the student.  (34 C.F.R. § 300.148(a).)  However, districts may be obligated to pay for the cost of a student's private schooling if the district denied the student a FAPE, and the private placement was appropriate.  (20 U.S.C. § 1412(a)(10)(C)(ii); (34 C.F.R. § 300.148(a); (*Florence County School Dist. Four v. Carter by and Through Carter* (1993) 510 U.S. 7, 11, 14 [114 S.Ct. 361].)  Administrative Law Judges have broad authority to fashion relief for failure to provide FAPE including reimbursement of private school tuition.  (*Forest Grove Sch. Dist. v. T.A.* (2009) 557 U.S. 230, 243-244, fn. 11 [129 S.Ct. 2484].)

Here, Student did not prove that the April 29, 2020 IEP denied Student a FAPE. Therefore, this Decision finds an award of tuition reimbursement is not justified.  (34 C.F.R. 300.148(a).)  Further, the evidence proved that Student attended less than one-half of the school days at Fairmont for the 2020-2021 school year.  The evidence further established Parent made the decision to enroll Student at Fairmont located in Fresno, California based largely upon its proximity to TALK ABA where Student received applied behavior analysis services funded by Parent's medical insurance.

For purpose of calculating remedies, the ALJ relied on Tulare City's school calendars for the 2019-2020 and 2020-2021 regular school years.  Student proved that Tulare City did not implement Student's July 30, 2019 IEP during the school closure from

March 23, 2020 through June 9, 2020.  Student missed IEP speech services consisting of 30-minutes of weekly speech services for approximately seven regular school weeks.  An award of "day-for-day compensation" is appropriate.  (*Forest Grove Sch. Dist., supra,* 557 U.S. at pp. 243-244, fn. 11 [129 S.Ct. 2484].)  Therefore, Student is entitled to 2.5 hours of compensatory speech therapy services.  This remedy is based upon 30-minutes of missed weekly direct speech and language services for approximately seven school weeks.

Student missed approximately two hours of physical therapy services consisting of 20-minute sessions, two times monthly for approximately two months.  Therefore, Student is entitled to two hours of compensatory physical therapy services.

As an additional remedy for Tulare City's failure to implement Student's academic instruction in Issue 1(c), Student is entitled to compensatory academic instruction for the period of March 23, 2020 through June 9, 2020.  Student would have received forty-two hours of academic instruction for this seven-week period, based upon a 90-minute school day, four days per week, less the 120 minutes monthly speech and language services and 40 minutes monthly physical therapy.  An award of forty-two hours is reasonable to compensate Student for the lack of academic instruction for this period.

ORDER

1. Tulare City shall provide Student with a total of 46.5 hours of compensatory education in the form of direct one-to-one speech and language services, physical therapy, or academic tutoring.  Student may use these hours for speech and language therapy, physical therapy, academic tutoring or any combination thereof at Parent's discretion.

2. Tulare City will provide and fund the services at Order 1 through its own staff, SELPA contractors or a certified non-public agency, at Parent's discretion.  Any services not used by December 31, 2022, shall be forfeited.

3. All other requests for relief are denied.

RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by it.  Pursuant to Education Code section 56505, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within 90 days of service.

*Jennifer Kelly*

Jennifer Kelly

Administrative Law Judge

Office of Administrative Hearings